Norman S. ADAMS, et al.,
Plaintiffs–Appellants,

v.

AVONDALE INDUSTRIES, INC.; Connell Industries, Inc.; Connell Limited Partnership, Defendants–Appellees.

No. 89–3634.

United States Court of Appeals,
Sixth Circuit.

Argued March 19, 1990.

Decided June 15, 1990.

David S. Mann (argued), Douglas M. Morehart, Taliaferro & Mann, Cincinnati, Ohio, for plaintiffs-appellants.

James A. Rydzel (argued), James O. Perrin, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for defendants-appellees.

Before GUY and BOGGS, Circuit Judges; and COHN, District Judge.[*]

**RALPH B. GUY, Jr., Circuit Judge.**

Plaintiffs, 40 salaried employees of the Ortner Freight Car Facility in Mount Orab, Ohio, appeal the district court's grant of summary judgment on their claim against Avondale Industries, Inc.,[1] the former owner of the Ortner facility. The claim arose from Avondale's sale of Ortner to a third party, Trinity Industries, Inc., and Avondale's subsequent refusal to pay either accrued vacation pay or severance benefits to the employees who remained at the facility. Finding that before the sale Avondale had amended its severance plan to deprive the plaintiffs of benefits, we affirm the district court's refusal to award severance benefits. Because we find that the defendant's obligation to pay vacation pay had vested before the sale and has not been subsequently discharged, however, we reverse on the second claim of error.

I.

From the time of its formation in September 1985, Avondale Industries maintained an unwritten policy of providing salaried employees at its Ortner Freight Car Division with severance benefits upon the involuntary termination of their employment. In January of 1987, Avondale sold all assets of the Ortner division to Trinity Industries, a wholly unrelated entity. Shortly before the sale, Avondale promulgated a Limited Severance Plan, amending its unwritten plan so as to deny severance pay to salaried employees who remained employed at the Ortner division after the sale of assets. Avondale then refused to pay severance benefits to Ortner's salaried employees who joined Trinity, contending that the sale did not trigger such payment according to the terms of either the original or the amended plan. Avondale also refused to pay plaintiffs vacation benefits that had vested according to the terms of Avondale's vacation plan on the grounds that Trinity had already assumed and discharged this obligation at Avondale's request.

The plaintiffs brought an action in the United States District Court for the Southern District of Ohio under the Employee Retirement Income Security Act of 1974 (ERISA), as amended, 29 U.S.C.

---

[*] The Honorable Avern Cohn, United States District Court for the Eastern District of Michigan, sitting by designation.

1. After the events giving rise to this litigation, in a separate and unrelated transaction, defendants Connell Industries, Inc., and Connell Limited Partnership purchased many of Avondale's assets. For the sake of clarity, defendants will be collectively referred to herein as "Avondale" or "defendant."

§ 1132(a)(1)(B) (1982), to recover benefits allegedly due under the unwritten severance plan and the vacation pay plan. Upon the close of discovery, the parties filed cross-motions for summary judgment. Plaintiffs argued that they were entitled to payment under the terms of the unwritten severance plan because they were "involuntarily terminated" within the meaning of the plan. They contended that the Limited Severance Plan was ineffective as an amendment of the unwritten plan because it was promulgated in a bad-faith attempt to avoid paying promised benefits. Avondale countered by arguing, *inter alia,* that the Limited Severance Plan was a valid amendment, and that in any case the sale did not constitute a termination within the meaning of the unwritten plan.

In an opinion reported at 712 F.Supp. 1291 (S.D.Ohio 1989), the district court granted the defendant's motion for summary judgment on the severance pay claim. After correctly announcing that an administrator's interpretation of an employee benefits plan under 29 U.S.C. § 1132(a)(1)(B) must be reviewed *de novo, Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989), the court determined that Avondale's Limited Severance Plan withstood "judicial scrutiny as a valid interpretation of the unwritten severance plan." *Avondale,* 712 F.Supp. at 1295. In light of this holding, the court declined to address defendant's argument that the Limited Severance Plan effected a valid amendment of the unwritten plan.

The district court then reviewed Avondale's refusal to pay the plaintiffs accrued vacation benefits, applying state law in reliance upon the Supreme Court's recent decision in *Massachusetts v. Morash,* —— U.S. ——, 109 S.Ct. 1668, 1672–73, 104 L.Ed.2d 98 (1989) (ERISA does not govern disbursement of unfunded vacation payments from a single employer's general assets). Finding that Trinity had already provided the plaintiffs with all vacation

benefits earned during their employment at Ortner in 1986 and early 1987, the district court found that the plaintiffs had "not sustained any damages," 712 F.Supp. at 1298, due to Avondale's refusal to pay. The court reasoned that to allow recovery against Avondale under these circumstances would be to award the plaintiffs a double recovery amounting to a "windfall" and, accordingly, granted the defendant summary judgment on the vacation pay claim.

Plaintiffs appeal, claiming that while the district court correctly identified the appropriate standard of review as *de novo,* it nevertheless subjected Avondale's interpretation of the unwritten severance plan to the more deferential "arbitrary and capricious" standard applied in this circuit before *Bruch. See Adcock v. Firestone Tire and Rubber Co.,* 822 F.2d 623, 626 (6th Cir.1987). With regard to the vacation pay plan, plaintiffs claim that Ohio law precludes the district court's finding that Trinity had discharged Avondale's obligation to pay accrued benefits, and that the court misread the stipulated facts when it found that awarding vacation pay would result in a windfall to the plaintiffs. We address the plaintiffs' claims of error with regard to each plan separately below.

## II.

### A. The Avondale Severance Benefits Plan

Until it adopted the Limited Severance Plan shortly before Ortner was sold, Avondale never had a written severance benefits plan.[2] The parties agree, however, that such a plan did exist and they have stipulated to its terms in the following language:

> Eligible salaried employees were entitled to one week of current salary for each year of service with Ortner with a minimum of two weeks and a maximum of eight weeks. Eligible salaried employees were those who were involuntarily terminated from service with Defendant Avondale. Persons who resigned, retired or

---

**2.** With regard to both the unwritten plan and the Limited Severance Plan, Avondale failed to comply with ERISA's requirements that it file an annual report, 29 U.S.C. § 1021(b)(4); distribute a summary plan description to employ-

ees, 29 U.S.C. § 1021(a)(1); and reduce the plan to writing, 29 U.S.C. § 1102(a)(1). The plaintiffs have not, however, asserted these procedural violations as grounds for substantive relief.

were fired for gross misconduct were not eligible for severance benefits.

The parties also agree that a period of unemployment following termination was never a prerequisite for obtaining severance pay under the unwritten plan. In fact, defendant acknowledges that prior to the sale of Ortner it had not denied severance benefits to any employee simply because he or she had immediately secured new employment upon termination.

On November 19, 1986, Avondale agreed to sell the assets of the Ortner division to Trinity Industries. Shortly thereafter, Avondale officials estimated the cost of providing severance and vacation benefits to all salaried Ortner employees taking positions with Trinity at $170,000. Avondale then composed the Limited Severance Plan, which purported to deny severance benefits to all salaried Ortner employees who accepted positions with Trinity, but to allow benefits to those who were either not offered such employment or who were offered but refused a position. Less than two weeks prior to the closing of the assets sale, the Limited Severance Plan was reduced to writing and distributed to some, but not all, of Ortner's salaried employees. The sale was closed on January 16, 1987, with the signing of a Purchase and Sale Agreement.

Trinity made a separate decision to rehire each one of the plaintiffs in this action. Of the 40 plaintiffs, none missed even one day of work as a result of the change of ownership, most retained identical job responsibility, and all but two were hired by Trinity at the salary they received while with Avondale. Trinity has no severance pay policy of its own and has declined to assume any severance obligations that may be owed to Ortner employees by Avondale. Nine former Ortner employees hired by Trinity at the time of the sale have since been involuntarily terminated and have received no severance pay.

**B. The Validity of the Limited Severance Plan**

The plaintiffs have brought this action pursuant to 29 U.S.C. § 1132(a) which provides, *inter alia*, that a "civil action may be brought ... by a participant or benefi-

ciary ... to recover benefits due to him under the terms of his plan. ..." It would seem elementary, therefore, that before determining what benefits are due, we must ascertain the terms of the plan in effect at the time of the assets sale. In order to do so, we are required to resolve a dispute between the parties as to whether the Limited Severance Plan constitutes a valid amendment of the unwritten plan. For guidance on this question, we turn to ERISA and the substantial body of case law applying its terms to benefit plan amendments.

■ Plaintiffs maintain that, by requiring plan administrators to satisfy fiduciary duties of care and loyalty when administering a benefits plan, Congress intended to foreclose amendment or termination of all benefit plans except where such action would be in the interests of plan participants. ERISA sets forth the fiduciary responsibility attaching to employee benefit plans in Subchapter I, Subtitle B, Part 4 of the Act, 29 U.S.C. §§ 1101–1114. Avondale, as the administrator and fiduciary of its severance plan, 29 U.S.C. § 1102(a), was required to conform to the following standard of care:

[1] a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ...

29 U.S.C. § 1104. Courts have read this section to impose "an unwavering duty on an ERISA trustee to make decisions with single-minded devotion to a plan's participants and beneficiaries and, in so doing, to act as a prudent person would act in a similar situation." *Morse v. Stanley*, 732 F.2d 1139, 1145 (2d Cir.1984), *quoted in*

*Berlin v. Michigan Bell Tele. Co.*, 858 F.2d 1154, 1162 (6th Cir.1988). *See also Donovan v. Bierwirth, 680 F.2d 263, 271 (2d Cir.)*, cert. denied, *459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). Fiduciaries who breach these duties may be held "liable to make good to such plan any losses to the plan resulting from each such breach...." 29 U.S.C. § 1109.*

While employers clearly must satisfy fiduciary duties when administering benefit plans, *Musto v. American General Corp.*, 861 F.2d 897, 910 (6th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989), it is equally plain that simply because an employer is also a benefits plan administrator "ERISA does not require that 'day-to-day corporate business transactions, which may have a collateral effect on prospective, contingent employee benefits, be performed solely in the interest of plan participants.'" *Hickman v. Tosco Corp.*, 840 F.2d 564, 566 (8th Cir.1988) (quoting *Phillips v. Amoco Oil Co.*, 614 F.Supp. 694, 718 (N.D.Ala.1985), *aff'd,* 799 F.2d 1464 (11th Cir.1986), *cert. denied,* 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987)). Whether Congress contemplated that an employer would be subject to the fiduciary duty requirement when amending an unfunded contingent benefit plan is best divined by examining the structure of the Act as a whole.

ERISA distinguishes between two species of benefit plans: "employee pension benefit plans" and "employee welfare benefit plans." *Compare* 29 U.S.C. § 1002(2)(A) *with* § 1002(1). It is now well established that severance benefit plans, such as the one before us here, are welfare benefit plans. *Morash,* 109 S.Ct. at 1671–72; *Holland v. Burlington Indus., Inc.,* 772 F.2d 1140, 1143 (4th Cir.1985), *summarily aff'd,* 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986). Subchapter I of the Act, entitled "Protection of Employee Benefit Rights," imposes obligations on pension benefit plan administrators in four separate areas: reporting and disclosure, §§ 1021–1031; participation and vesting, §§ 1051–1061; funding, §§ 1081–1086; and fiduciary responsibility, §§ 1101–1114. Welfare benefit plan administrators are required to comport with the fiduciary responsibility requirements and the reporting and disclosure requirements. They are explicitly exempted, however, from the obligations of the participation and vesting sections and the funding sections of the Act. 29 U.S.C. §§ 1051, 1081.

Although Congress considered imposing vesting requirements on welfare benefits, it decided to limit vesting to pension plans in order to "keep [ ] costs within reasonable limits." S.Rep. No. 383, 93d Cong., 2d Sess. 18, *reprinted in* 1974 U.S.CODE CONG. & ADMIN.NEWS 4639, 4890, 4903 and in 1 Legislative History of the Employee Retirement Income Security Act of 1974 at 1086 (1976); Note, *Unfunded Vacation Benefits: Determining the Scope of ERISA,* 87 Colum.L.Rev. 1702, 1715 (1987). Apparently, Congress chose not to impose vesting requirements on welfare benefit plans for fear that placing such a burden on employers would inhibit the establishment of such plans. *See* Note, *supra,* 87 Colum.L.Rev. at 1715 n. 93 and accompanying text. In drawing the line between employer actions subject to the fiduciary duty requirement and those not, we must avoid any rule that would have the effect of undermining Congress' considered decision that welfare benefit plans not be subject to a vesting requirement. We are compelled, therefore, to reject plaintiffs' proposed rule that welfare benefit plans such as the one before us be amended or terminated only when such action would be in the best interests of the employees. To adopt such a requirement would, in effect, accord employees a vested right to welfare benefits, thereby upsetting ERISA's delicate balance in this area. Instead, we employ the rule, already announced by this circuit as dicta in *Musto,* 861 F.2d at 911, that a company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan. In so doing, we join the majority of circuits that have already ruled on this issue.

The extent to which fiduciary duties govern an administrator's decision to amend or terminate a benefits plan was first addressed by the Fourth Circuit in *Sutton v. Weirton Steel Div. of National Steel Corp.,* 724 F.2d 406 (4th Cir.), *cert. denied,*

467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984). In *Sutton,* the defendant corporation provided unfunded early retirement and severance pay benefits in the event of "termination" from employment with the company. As part of an agreement to sell the division for which plaintiffs worked, defendant provided that the sale would not trigger payment of these contingent benefits. In the face of a finding that the "sole motivation for the sale was avoiding future pension obligations," 724 F.2d at 410, the Fourth Circuit answered the "critical question," whether ERISA "imposes any fiduciary obligations to maintain the contingent benefits about which the appellants complain," *id.,* in the following language:

> The accrued benefits secured by ERISA do not encompass unfunded, contingent early retirement benefits or severance payments. The Act was not designed to prohibit modification of these ancillary benefits. Rather, Congress believed that the "vesting of these ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income." An employer may change such benefits without violating ERISA. Any right to payment of benefits before normal retirement age must be found in pertinent employment agreements.

*Id.* (citations omitted).

The Seventh Circuit adopted the reasoning of *Sutton* in *Young v. Standard Oil (Indiana),* 849 F.2d 1039 (7th Cir.), *cert. denied,* 488 U.S. 981, 109 S.Ct. 529, 102 L.Ed.2d 561 (1988). In *Young,* the defendant employers amended their severance plan shortly before the sale of a division in order to avoid paying an estimated $6.2 million in severance benefits. The original plan, providing that employees would not receive severance pay in the event of a "sale of facilities when the new owner offers to the employee *comparable employment,*" 849 F.2d at 1041 (emphasis in original), was amended to provide that severance benefits would not be paid when an employee was offered any position with the purchasing company, comparable or not.

When the division was sold and the purchasing company offered plaintiffs employment that was not comparable, plaintiffs sued to enforce the terms of the original severance plan, claiming that the unilateral amendment to the plan was void as a violation of the defendants' fiduciary duty. The Seventh Circuit rejected this argument in the following passage:

> [S]everance benefits are unaccrued, unvested benefits. Moreover, severance benefit plans, though subject to certain disclosure (29 U.S.C. §§ 1021–1031) and fiduciary (29 U.S.C. §§ 1101–1114) requirements, are exempt from the more stringent ERISA requirements. 29 U.S.C. §§ 1051, 1081. An employer may therefore, unilaterally amend or eliminate a severance plan without violating ERISA. This is so because an employer is permitted to act in a dual capacity as both the manager of its business and a fiduciary with respect to unaccrued benefits. An employer is therefore, free to alter or eliminate severance benefits (which are usually solely funded by the employer) without consideration of the employees' interests. In short, an employer does not owe its employees a fiduciary duty when it amends or abolishes a severance benefit plan.

*Young,* 849 F.2d at 1045 (citations omitted).

The same conclusion has been reached by the Eleventh Circuit, which has held that "ERISA simply does not prohibit a company from eliminating previously offered benefits that are neither vested nor accrued." *Phillips v. Amoco Oil Co.* 799 F.2d 1464, 1471 (11th Cir.1986), *cert. denied,* 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987).

In this circuit's first foray into the area, we held that an employer could lawfully exercise an expressly reserved power to terminate an employee welfare benefit plan that was providing benefits for employees who had already retired. *In re White Farm Equipment Co.,* 788 F.2d 1186 (6th Cir.1986). In declining the district court's invitation to adopt a broad prohibition against termination of welfare benefits for retired employees, we found that

the conscious exclusion of welfare plans from the complex and finely-tuned compromise provisions on vesting, participation and funding applicable to pension plans and the provision for distribution of welfare plan assets on termination counsel strongly against imposition of mandatory vesting standards through case law....

*Id.* at 1192. Nevertheless, we declined, on the facts of that case, to grant plan administrators carte blanche to amend or terminate even unfunded, unvested, welfare benefits, writing:

> [W]e are not in disagreement with the district court's conclusion "that no leap of logic transforms Congress' exclusion of welfare benefit plans from various ERISA requirements into an express endorsement of unfettered unilateral termination of such plans."

*Id.* (citation omitted). *White Farm*, therefore, established the rather modest rule that "the parties may themselves set out by agreement or by private design, as set out in plan documents, whether retiree welfare benefits vest, or whether they may be terminated." *Id.* at 1193.

We addressed the same issue again two years later in *Musto*. In *Musto*, the defendant corporation established an employee welfare benefits plan that included within its provisions an express reservation of plenary power to amend or terminate the plan at any time. When the defendant amended the plan to require, *inter alia*, partial payment of health insurance premiums from retired employees, those employees sued claiming a breach of fiduciary duty. We held to the contrary, explaining that the defendant "had no fiduciary duty to establish any medical insurance plan, much less one that could never be amended without the approval of those to whom it applied," and therefore that "[i]t is hard to see how the company's express reservation of a right to amend the plan can be said to constitute 'overreaching' when a prudent employer ... could well have decided ... not to provide such coverage at all...." *Musto*, 861 F.2d at 912.

We then reinforced our decision in *Musto* by joining those circuits that have held an employer has no fiduciary duty with regard to the amendment or termination of a welfare benefits plan:

> The case law, in any event, makes it clear that when an employer decides to establish, amend, or terminate a benefits plan, as opposed to managing any assets of the plan and administering the plan in accordance with its terms, its actions are not to be judged by fiduciary standards.

*Musto*, 861 F.2d at 912.

■ The plaintiffs are correct in distinguishing *White Farm* and *Musto* on the grounds that both of these cases involved an employer's exercise of an explicitly reserved power to amend its benefits plan, while Avondale's severance plan includes no such reservation. This failure is particularly troubling when one considers ERISA's admonition, contained in Part Four entitled "Fiduciary Responsibility," that: "Every employee benefit plan shall ... (3) provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan." 29 U.S.C. § 1102(b). The provision serves the important purpose of insuring "against the possibility that the employee's expectation of the benefit would be defeated," *Morash*, 109 S.Ct. at 1673, by an unanticipated amendment of a welfare plan, whose benefits employees may come to take for granted. We do not believe, however, that Congress intended that any plan failing to comply with section 1102(b) would, for that reason alone, become unamendable. Plaintiffs have failed to show any detrimental reliance based on the defendant's failure to comply with section 1102(b), and, under these circumstances, we decline to impose the substantive remedy of prohibiting plan amendment in response to defendant's procedural violations. *Blau v. Del Monte Corp.*, 748 F.2d 1348, 1353 (9th Cir.1984), *cert. denied*, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985) (absent a defendant's bad-faith failure to comply with ERISA's reporting requirements, employees ordinarily have no substantive remedy under the Act).

Finally, we note that nothing in the Supreme Court's recent decision in *Bruch* implies the invalidity of the case law excluding amendments of welfare benefit plans from scrutiny under ERISA's fiduciary duty requirements. *Brown v. Ampco-Pittsburgh Corp.*, 876 F.2d 546, 552 (6th Cir.1989) (Nelson, J., concurring). The Supreme Court's holding in *Bruch* was explicitly "limited to the appropriate standard of review in § 1132(a)(1)(B) actions challenging denials of benefits based on plan interpretations." *Bruch*, 109 S.Ct. at 948.

■ Having found that the Limited Severance Plan effected a valid amendment of the unwritten severance pay plan, we read its unambiguous terms to preclude the plaintiffs' claims for severance pay. We therefore express no opinion as to the accuracy of the district court's interpretation of the unwritten plan.[3] It is important to note, however, that several of the "factors" employed by the district court to interpret the plan, while well-suited to determining whether an administrator's interpretation is "arbitrary and capricious," have less utility in divining the intent of the parties as required by *Bruch*. For example, the district court noted that this circuit has looked to "consistency" when reviewing benefit plans in the past, asking whether "the employer [has] followed the same approach in similar situations." *Avondale*, 712 F.Supp. at 1295 (citations omitted). While we have indeed considered this factor in several of our opinions, we did so with an eye toward determining whether an administrator's decision was so anomalous as to appear "arbitrary and capricious" in light of past statements and actions. *See, e.g., Adcock*, 822 F.2d at 626. We doubt whether consistency of interpretation will continue to play such a prominent role in the *de novo* interpretation of the terms of ERISA plans under section 1132(a)(1)(B). The district court

also notes that "the Court should closely scrutinize an employer's interpretation of a benefit plan when the employer has avoided a large outlay as a result of its decision." *Avondale*, 712 F.Supp. at 1295 (citations omitted). Again, this rule was useful for singling out situations in which an employer might be likely to act in an arbitrary and capricious manner, but it is simply inapposite to the process of *de novo* interpretation. *De novo* interpretation looks to the terms of the plan, not to either party's interpretation of those terms. *Bruch*, 109 S.Ct. at 955. Courts should proceed carefully before applying rules developed specifically to ferret out arbitrary and capricious action when interpreting the terms of a plan *de novo*. *See Ulmer v. Harsco Corp.*, 884 F.2d 98, 104 (3rd Cir.1989); *Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134, 147–48 (3rd Cir.1987), *rev'd on other grounds, Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

## III. *The Vacation Benefits Plan*

■ Before proceeding to an analysis of plaintiffs' vacation pay claims, it is useful to review the differences between the Avondale vacation plan and the Trinity plan offered to the employees who remained with Ortner after the sale. According to the Avondale plan, at the beginning of each calendar year an employee acquired a vested right to all vacation pay earned while working for Avondale the previous year. The employee could then take his allotted time off with full pay at any time during the next 12 months.

Trinity, while offering roughly the same amount of paid vacation per year of service, calculates the vesting of vacation pay somewhat differently. The Trinity plan provides that salaried employees earn and expend their vacation benefits in the same

---

**3.** The interpretation of a severance plan is necessarily a highly fact-specific inquiry in which precedent will often provide little guidance. Nevertheless, we note that at least one circuit has reversed as "arbitrary and capricious" an administrator's decision that a sale of assets did not effect a "termination" of employees from their jobs with the selling company. *Harris v. Pullman Standard, Inc.*, 809 F.2d 1495, 1498

(11th Cir.1987); *accord Bennett v. Gill & Duffus Chemicals, Inc.*, 699 F.Supp. 454, 458–62 (S.D.N.Y.1988). In the only circuit court decision to address the issue since the *Bruch de novo* standard, the Third Circuit has held that the sale of a going concern effected a "termination" of employment requiring payment of severance benefits. *Ulmer v. Harsco Corp.*, 884 F.2d 98, 104 (3rd Cir.1989).

year. No vacation benefits vest for the year until June 1. After June 1, an employee may take all of his earned vacation time for that calendar year.[4] Trinity generally gives no vacation pay to employees in their first year.

Both Avondale and Trinity calculate the amount of vacation pay an employee is entitled to in a given year by the number of years the employee has worked with the company, from a minimum of two weeks for employees having worked one year, to a maximum of four weeks for those who have worked 20 years or longer.[5] In calculating "length of service" after the assets sale, Trinity credited Ortner employees for their years of service with the division and allowed plaintiffs to take a vacation during their first year at Trinity. Giving such credit was Trinity's standard practice upon the purchase of a new division. Trinity was not obligated in any way to offer this credit, and Avondale gave Trinity no consideration in exchange for the practice.

All but two of the plaintiffs received vacation pay from Trinity in 1987 that either equaled or exceeded the dollar amount of vacation they had accrued at Avondale in 1986. At least one plaintiff, who left Trinity before June 1, 1987, however, received no vacation benefits at all from Trinity.

Because vacation plans in which a single employer pays benefits from its general

assets do not constitute "employee benefit plans" within the meaning of ERISA, we look to the law of Ohio in determining plaintiffs' rights under Avondale's vacation plan. *Morash*, 109 S.Ct. at 1675.

The record is clear that, at least as of the date Ortner was sold, Avondale owed vacation benefits to the plaintiffs for the work they performed while at Avondale in 1986. The Avondale vacation plan provided for the vesting of vacation pay as follows:

> An employee earns vacation over the course of the calendar year.... As of January 1 immediately following such calendar year, the employee becomes entitled to and vested in the vacation which had been earned in the previous year.

Furthermore, the plan provided for payment of accrued vacation pay upon termination of employment in the following unequivocal language:

> An employee whose employment is terminated for any reason shall receive vacation pay not yet received if eligible for such vacation pay under the provisions of this Article.

*Avondale*, 712 F.Supp. at 1293.[6] Finally, the Limited Severance Plan expressly leaves this obligation unimpaired:

> You will receive your vacation pay for 1987 which you earned by working in 1986 in accordance with the Company

---

4. If terminated from employment with Trinity after June 1, the employee is paid for any unused, earned vacation; however, employees terminated prior to June 1 receive no vacation pay for the calendar year of departure. An employee who takes vacation prior to June 1 and then leaves Trinity prior to June 1 must return his vacation pay through a deduction from his last payroll check.

5. Avondale's policy provides as follows:
   An employee earns vacation over the course of the calendar year in accordance with the following schedule:
   After 1 year of service:    2 weeks
   . . .
   after 10 years of service:  3 weeks
   after 20 years of service:  4 weeks
   Trinity established the following vacation policy for salaried employees at the Mount Orab facility:
   *Vacation Plan*: vacation is earned on June 1 based on your length of service at Ortner.

Current employees or those rehired during 1987 will receive vacation based on the following schedule:

| *More than or Equal to* | *But Less Than* | *Hours of Paid Vacation* |
| --- | --- | --- |
| 1 year | 5 years | 2 weeks |
| . . . | | |
| 10 years | 20 years | 3 weeks |
| 20 years+ | | 4 weeks |

6. The district court purports to quote the above language from the vacation pay plan itself. We note an inconsistency between this quotation and the parties' stipulation which provides that:

> Avondale's written vacation pay policy was silent regarding payment of unused vacation upon a salaried employee's termination. However, Avondale has paid terminated employees unused earned vacation pay.

We regard this disparity as inconsequential, however, in light of the clear purport of the Limited Severance Plan excerpted *infra*.

vacation plan in effect on January 1, 1986.

Avondale argues, however, that any obligation it owed to Ortner employees at the time of the sale has since been discharged by Trinity. Avondale contends that, under Trinity's vacation policy as it existed at the time of the Ortner sale, new employees did not earn vacation benefits in their first year of employment. Avondale then asserts that Trinity agreed, in response to an inquiry from Avondale, to make an exception to this policy with regard to the Ortner sale by providing the division's employees with vacation during their first year in an amount equivalent to the vacation they would have received had they continued to work for Avondale. Defendants conclude, on this basis, that Avondale's obligation has been discharged by Trinity's substitute performance.

Avondale's argument is flawed in several respects. First, it is clear from the record that Trinity never agreed with Avondale to assume Avondale's vacation pay obligations to the plaintiffs. Defendant's protestations to the contrary are unavailing against the parties' stipulation that (i) Avondale imposed no contractual obligation on Trinity to offer vacation credit to Ortner employees for years of service, (ii) Avondale neither gave nor offered Trinity any consideration in exchange for the vacation pay credit, and (iii) Trinity's practice in previous acquisitions had always been to give employees of the acquired entity credit for service with the acquired entity. Furthermore, the Purchase and Sale Agreement provides in no uncertain terms that Trinity did not assume Avondale's obligation to pay the Ortner employees any benefits still owing at the time of the sale:

> It is understood and agreed that Purchaser is only purchasing certain assets of Seller, that Purchaser is not intended to be a successor to Seller for any purpose unless expressly set forth herein, and that Purchaser has not assumed, and expressly denies assumption hereby of, any other liability, obligation or commitment of Seller other than as set forth above or otherwise expressly set forth herein.

The only direct evidence Avondale presents in support of its argument that Trinity provided benefits to Ortner employees with the intent of satisfying Avondale's obligations is the following excerpt from the deposition of a Trinity vice president:

> Q. [I]s it a fair statement that those employees who went to work for Trinity after the closing received during 1987 vacation that they would have received had there been no closing?
>
> A. Yes, so as far as I know, that was the intention.
>
> . . . .
>
> Q. But your intention was. . . .
>
> . . . .
>
> Q. To make sure they didn't lose any vacations in 1987 as a result of the sale. Is that a fair statement?
>
> A. Yes.

This answer reveals no information relevant to the disposition of the issue before us, however. The fact that Trinity intended to ensure that Ortner employees would not suffer diminished benefits upon the change of ownership would seem to evince no more than Trinity's straightforward desire that the Ortner facility retain its employees by continuing to compensate them adequately.

Finally, Avondale contends that were the plaintiffs to recover the vacation benefits sought in this case, they would receive twice as much vacation pay in 1987 as they would have been entitled to had they remained with Avondale. The defendant asserts that Trinity had no reason to provide the plaintiffs with such a "windfall," and therefore that Trinity must have intended to discharge the defendant's obligations when it paid for plaintiffs' vacations in 1987. We reject defendant's analysis.

Avondale's argument proceeds from the premise that Trinity intended to place employees of its newly-acquired division in the same position they would have been in had the sale of assets never occurred. Defendant contends that Trinity must therefore have intended that Ortner employees would be given the same amount of vacation in 1987 as they would have been given had

the division not been sold, and that the employees would be paid the same wages during that vacation as they would have been paid in the absence of the sale. If Trinity's payment does *not* effect a discharge, Avondale contends, the objective of leaving employees' benefits unchanged by the sale of assets is frustrated. The following example is used to illustrate this point. Suppose that after June 1, 1987, but before January 1, 1988, an Ortner employee takes a vacation. Trinity pays his wages during that vacation, placing him in a position *identical* to the position he would have been in had the sale of assets never taken place. If, however, the employee is allowed to recover vacation pay from Avondale, he is in a *better* position than he would have been in had there been no sale. He has taken the same amount of vacation in 1987 as he would have taken had he remained at Avondale, but he has been paid *more*: he has been paid his salary during the two weeks by Trinity *and* he has been paid the equivalent of his salary for two weeks by Avondale. Surely, Avondale argues, Trinity did not intend to place Ortner employees in a *better* position because of the sale. Trinity wanted its new employees to take a paid vacation in 1987, but it did not want them to be paid *double* during those two weeks. According to this argument, when Trinity paid for the vacations taken by Ortner employees during 1987, it must have intended to discharge Avondale's legal obligation.

In addressing this contention, it must be understood that Avondale's argument is simply an attempt to prove, through circumstantial evidence, that Trinity *intended* to discharge Avondale's obligation. Given the premise that Trinity's objective was to place Ortner employees in as good a position as they would have been in had the sale of assets never occurred, Trinity must have looked to the employees' expectations of benefits at the time of the sale, with the understanding that the employees might leave Ortner at any time—not only in 1987, but in 1988 and beyond. When we look at an Ortner employee's expectation of benefits, we see that the Trinity plan alone does not place him in as favorable a position as

he would have been in had he remained at Avondale. The reason is that an employee who leaves Trinity between January 1 and June 1 of any given year will receive no benefits during that year from Trinity, while he would have received benefits had he remained at Avondale. To illustrate, suppose the sale of assets had never occurred, and that an employee were to leave Ortner between January 1 and June 1 of 1988. The employee would depart with the following benefits in his "bank": one year of benefits paid in 1987 for work performed in 1986 and one year of benefits paid in 1988 for work performed in 1987. Because the sale of assets did occur, the Ortner employee, now working at Trinity, will in fact leave with less in his "bank"; he will have accumulated one year of benefits, paid in 1987 for work performed through June 1, 1987, and that is all. He is in a *worse* position because of the sale. According to Avondale's own argument, Trinity did not intend for Ortner employees to be in a *worse* position because of the sale of assets. Trinity could not, therefore, have intended that payments it made in 1987 would discharge Avondale's obligation to pay benefits accrued in 1986.

Defendant also relies on a case decided by the Ohio Court of Appeals, *Armstrong v. Diamond Shamrock Corp.*, 7 Ohio App.3d 296, 455 N.E.2d 702 (1982), which it contends is dispositive of this appeal. In *Armstrong*, the defendant sold one of its divisions pursuant to an agreement in which the purchaser specifically agreed to pay for all vacations taken after a given date. Plaintiffs, employees of the acquired division, took vacations after the specified date, received pay from the purchasing corporation, and then demanded additional payment from the defendant based on the terms of its vacation plan. The court of appeals refused to allow duplicative recovery in this instance, holding that the defendant "unquestionably made a third-party beneficiary contract with [the purchaser], under which [the purchaser] agreed to satisfy defendant's vacation benefit obligations to these creditor-beneficiary employees." 7 Ohio App.3d at 299, 455

**954**

N.E.2d at 705 (citations omitted). As discussed above, no such third-party beneficiary contract between Avondale and Trinity, whether written or oral, express or implied, appears in the record before us. Nor is there any evidence that Trinity understood that it was discharging Avondale's obligation when it offered vacation credit to the plaintiffs. Under these circumstances, Avondale's duty was clearly not discharged, *see* RESTATEMENT (SECOND) OF CONTRACTS § 318, and summary judgment ought to have been entered in favor of plaintiffs on their claim for vacation pay.

The judgment of the district court is AFFIRMED in part and REVERSED in part and the case is REMANDED for disposition in accordance with this opinion.