914 F.2d 259
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Albert R. VARHOLA, et al., Plaintiffs-Appellants/Cross-Appellees,
v.
CYCLOPS CORPORATION, et al., Defendants-Appellees/Cross-Appellants.
 Nos. 89-3506, 89-3507.
 United States Court of Appeals, Sixth Circuit.
 Aug. 29, 1990.
 
 Before KENNEDY and BOGGS, Circuit Judges, and TIMBERS, Senior Circuit Judge.*
 PER CURIAM.
 
 
 1
 The twelve plaintiffs appeal, and the defendants cross-appeal, an order of the district court resolving the plaintiffs' claims brought under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Sec. 1001 et seq.[1] The district court found that the plaintiffs were not entitled to certain pension benefits, but were entitled to severance pay, when Cyclops sold the coke plant where they were employed. Finding that the plan administrator's decision to deny pension benefits and severance pay was not arbitrary and capricious, we affirm the denial of pension benefits and vacate the award of severance pay.
 
 
 2
 * A
 
 
 3
 On November 26, 1985, on cross-motions for summary judgment, the district court ordered that the plaintiffs were entitled to "permanent shutdown" pension benefits, which included medical insurance benefits, but granted summary judgment for the defendants on all other counts. On appeal, we affirmed in part and remanded, finding that there were factual issues that needed to be resolved at a trial and instructing the district court to review the plan administrator's determinations under an "arbitrary and capricious" standard of review. Varhola v. Doe, 820 F.2d 809 (6th Cir.1987) ("Varhola I "). Following a three-day bench trial, the district court held that the plaintiffs were not entitled to shutdown pension benefits, but were in that case entitled to severance pay (an issue on which the court had earlier reserved judgment). The plaintiffs appeal the denial of shutdown benefits, and the defendants cross-appeal the granting of severance pay.
 
 
 4
 Cyclops Corporation (Cyclops) produces steel. Before November 22, 1980, Cyclops operated a steel-making facility, including a coke plant, near Portsmouth, Ohio. In early 1980, Cyclops closed all operations (including the open hearth furnaces and the blast furnace) at the Portsmouth facility except the coke plant, which it operated until August 1980 while trying to find a buyer to purchase the coke plant as a going concern. On August 25, 1980, coke production at the plant stopped, but the ovens were kept hot so as to maintain the plant's ability to resume production. On November 21, 1980, Cyclops sold the coke plant to New Boston Coke Corporation.
 
 B
 
 5
 The plaintiffs claim that the motivation behind Cyclops's attempt to sell the coke-making portion of the Portsmouth facility was to save Cyclops millions of dollars by passing along accrued pension liabilities to the purchaser. Cyclops engaged an actuarial firm to calculate the pension liabilities it would face from shutting down the entire Portsmouth facility. The plaintiffs allege that upon discovering the extent of the liability, Cyclops transferred certain workers who worked in the open hearth and blast furnaces to the coke plant so as to avoid having to pay them retirement or severance benefits. On October 28, 1980, less than a month before the sale, Cyclops convened a meeting with the plaintiffs at which the plaintiffs were informed that they were not entitled to plant shutdown pensions. The plaintiffs claim that this decision was made without regard to the provisions of the company's pension plan. The plaintiffs also allege that the Pension Board never investigated the particular employment circumstances of the individual plaintiffs before ruling on their pension applications. They claim that the Board's disregard for the terms of the plan and its failure to investigate each application constituted arbitrary and capricious behavior.
 
 
 6
 The Pension Plan for Salaried Employees of Cyclops Corporation, effective November 1980, contains two retirement benefit provisions (Secs. 4.7 and 4.8) relevant to this dispute. Under the terms of these provisions, employees were eligible to receive full retirement benefits if their terms of service were broken "because of" or "by reason of" a "shutdown of a division, plant, office or department." In fact, qualifying employees who worked in the open hearth and blast furnace operations were granted pensions. The dispute in this case is whether the coke plant employees suffered a break in their continuous service "because of" a "permanent shutdown" in the same way that the other employees did.
 
 
 7
 Section 10.1 of the pension plan defines "continuous service" as "service with the Company ... whether on a salaried or hourly basis...." Section 10.1(e) provides that an employee:
 
 
 8
 shall incur a break in continuous service upon:
 
 
 9
 * * *
 
 
 10
 * * *
 
 
 11
 (4) termination due to permanent shutdown of a division, plant, office or department, or subdivision of any of them;
 
 
 12
 * * *
 
 
 13
 * * *
 
 
 14
 This provision unfortunately sheds no light on the definition of "permanent shutdown."
 
 
 15
 The parties agree, of course, that the plaintiffs suffered a break in their continuous employment with Cyclops after November 21, 1980. The dispute originally was whether that break in service resulted from a "permanent shutdown" of a plant. Cyclops contended that, although the blast furnace and the open hearth furnaces were shut down, the coke plant was purposely not shut down. The plaintiffs countered that, as to Cyclops, the coke plant was permanently shut down when it was sold; "permanent shutdown" must be defined in terms of Cyclops's own operation of the coke plant. At trial, the district court resolved this dispute in favor of Cyclops by determining that the plan administrator had not acted arbitrarily and capriciously when it found that there was no permanent shutdown.[2] The plaintiffs do not argue on this second appeal that such a finding was clearly erroneous; instead, they argue that the plan administrator acted arbitrarily and capriciously by granting pension benefits to three employees similarly situated to the plaintiffs, by acting under a conflict of interest, and by breaching a fiduciary duty.
 
 
 16
 When New Boston Coke Corporation agreed to buy the coke plant, it wanted experienced employees to continue the operations. All of the plaintiffs were on a list of 28 employees, designated to remain at the coke plant, that Cyclops provided to New Boston. Cyclops denies that the creation of the list was motivated by a desire to save money on pension costs. The plaintiffs were told, however, that if they refused to work for New Boston, they would not be eligible under the plan for shutdown pensions. All of the plaintiffs decided to work for New Boston. New Boston agreed to assume all accrued pension liabilities, as Cyclops had requested.
 
 
 17
 On November 21, 1980, plaintiffs' employment with Cyclops ended, and on November 22, 1980, their employment with New Boston began. Cyclops transferred to the New Boston pension plan certain assets worth $60,521 that had been held by the Cyclops pension plan. Those assets represented the portion of the total Cyclops pension plan assets that could be allocated to the 28 listed employees. The eligibility requirements for pensions at New Boston were identical to those under Cyclops's plan, and New Boston gave credit for all years of service with Cyclops. Five plaintiffs have retired or died, and they or their spouses are receiving benefits under the New Boston plan. Cyclops asserts that had those plaintiffs received the shutdown pensions under the Cyclops plan, they would now be receiving overlapping pension benefits.
 
 
 18
 Cyclops had also established a severance pay plan, effective November 1, 1980, that provided as follows:
 
 
 19
 Under certain business conditions it may become necessary for the company to terminate the employment of certain salaried employees and the purpose of the allowance, granted solely at the discretion of the company, and as provided in this policy, is to give financial assistance to such employees to the extent possible.
 
 1. Eligibility:
 
 20
 1.1 A full-time salaried employee of any division's [sic] or corporate office is eligible for a severance allowance if his employment is permanently terminated by the company, because of the curtailment, elimination or revision of the functions being performed by the employee.
 
 
 21
 1.2 An employee is not eligible for a severance allowance if he is terminated under any of the following conditions:
 
 1.2.1 Voluntary resignation
 1.2.2 Discharged for cause
 
 22
 1.2.3 Retirement under company plan other than a deferred vested pension.
 
 1.2.4 Pregnancy
 
 23
 1.2.5 Disability under which he is entitled to benefits provided by either a company program or workmen's compensation insurance.
 
 
 24
 1.2.6 Refusal to accept another position within the company which provides approximately the same current earnings.
 
 II
 
 25
 In remanding this case in the first appeal, we instructed the district court to apply the "arbitrary and capricious" standard to its review of the plan administrator's decision to deny the plaintiffs pension benefits. Varhola I, 820 F.2d at 813-14. Between the time of the decision in Varhola I and the district court's opinion after remand, the Supreme Court decided Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948 (1989). In Bruch, the Court determined that an administrator's interpretation of an employee benefits plan under 29 U.S.C. Sec. 1132(a)(1)(B) must be reviewed de novo, unless the benefits plan gives the administrator discretion in distributing benefits. Id. at 956; Adams v. Avondale Industries, Inc., 905 F.2d 943, 945 (6th Cir.1990).
 
 
 26
 On remand, the district court determined that it was not bound by Bruch, but rather by our order to apply the "arbitrary and capricious" standard of review:
 
 
 27
 This court is bound by the law of this case as mandated by the United States Court of Appeals for the Sixth Circuit which remanded this case with clear instruction in Varhola v. Doe, 820 F.2d 809 (6th Cir.1987), notwithstanding the effect, if any, of the recent opinion by the Supreme Court of the United States in Firestone Tire & Rubber Co. v. Bruch, 109 S.Ct. 948, --- U.S. ---- (1989).
 
 
 28
 The Court of Appeals has instructed that the standard of review of the Cyclops Pension Board's determination to deny plant shutdown pensions to plaintiffs is limited to whether the Pension Board's decision was arbitrary and capricious; this standard was narrowly and explicitly set forth in Varhola, 820 F.2d at 813.
 
 
 29
 The plaintiffs argue that Bruch altered the standard of review to be applied in benefits cases, and that the district court blindly applied the standard dictated in Varhola I without regard to the intervening change in the law. For this reason, the plaintiffs urge us to reverse the judgment of the district court.
 
 
 30
 The plaintiffs argue that the Bruch rule applies retroactively to this case. The general practice is that, where the Court makes no statement as to whether a new rule should have retroactive effect, the rule applies retroactively. We have previously assumed that the de novo standard of review rule announced in Bruch is to have retroactive effect. See Brown v. Ampco-Pittsburgh Corp., 876 F.2d 546, 550 (6th Cir.1989). In this case, however, Bruch does not require the application of a de novo standard of review. The plaintiffs' arguments to the contrary do not withstand scrutiny.
 
 
 31
 The plaintiffs argue that the exception to the rule mandating a de novo standard of review--where "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," Bruch, 109 S.Ct. at 956, as Cyclops's does--is inapplicable to this case for two reasons. First, the Supreme Court divined the exception to the de novo standard of review by reference to trust law; the pension plan at issue is not a trust instrument, and therefore the de novo standard must be applied without exception. Second, as officers of a corporation that wished to save money, the members of the Pension Board were operating under a conflict of interest when making benefits determinations; under these circumstances, Bruch requires that courts more strictly review the actions of administrators who have discretionary authority.[3]
 
 
 32
 We find that the Cyclops pension plan explicitly granted the plan administrator discretionary authority to determine eligibility. Section 12.2 of Cyclops's pension plan states:
 
 
 33
 (a) The Pension Board shall be the Plan Administrator and Named Fiduciary of the Plan with respect solely to the operation and administration of the Plan and shall have the power, duty and responsibility to:
 
 
 34
 (1) determine the eligibility of any Employee, Participant, co-pensioner, spouse or beneficiary to participate in or receive benefits under the Plan;
 
 
 35
 (2) settle any disputes which may arise in the operation of the Plan;
 
 
 36
 (3) determine the interest of any person in the Plan and Pension Trust;
 
 
 37
 (4) interpret any provision of the Plan;
 
 
 38
 * * *
 
 
 39
 * * *
 
 
 40
 This provision gives the plan administrator (the Pension Board) discretion in construing the pension plan, and under these circumstances, the more deferential "arbitrary and capricious" standard of review applies. See Lakey v. Remington Arms Co., 874 F.2d 541, 544-45 (8th Cir.1989); Curtis v. Noel, 877 F.2d 159, 161 (1st Cir.1989).
 
 
 41
 The contention that the Pension Board was interpreting a plan contract, not a trust instrument, presents a false distinction. There is no reason to apply a different standard of review to instruments in technically different forms that accomplish identical objectives. "To vary the standard of judicial review for general asset welfare plans would only sow confusion in ERISA, which we decline to do." Holland v. Burlington Industries, Inc., 772 F.2d 1140, 1148 (4th Cir.1985), aff'd mem. sub nom. Brooks v. Burlington Industries, Inc., 477 U.S. 901 (1986). It is significant that the plan in Bruch was not in the form of a trust instrument:
 
 
 42
 Firestone ... had not established separate trust funds out of which to pay the benefits from the plans. All three of the plans were either "employee welfare benefit plans" or "employee pension benefit plans" governed (albeit in different ways) by ERISA.
 
 
 43
 109 S.Ct. at 951. The Bruch Court assumed, therefore, that the same standard of review (de novo ) should apply to all benefits cases, regardless of the form in which the plan is presented, absent a showing of discretionary authority in the administrator.
 
 
 44
 The plaintiffs' second contention, that a conflict of interest made the "arbitrary and capricious" standard inapplicable, was rejected by the Bruch Court. A conflict of interest does not change the standard of review; rather, it is a factor to be weighed in determining whether a plan administrator with discretionary authority abused his discretion (i.e., acted arbitrarily and capriciously). Bruch, 109 S.Ct. at 956. We have adopted the Supreme Court's reasoning. See Davis v. Kentucky Finance Cos. Retirement Plan, 887 F.2d 689, 694 (6th Cir.1989) ("The fact that the Retirement Committee that administers the plan is composed of management-level employees of KFC is significant only to the extent that any possible conflict of interest should be taken into account as a factor in determining whether the Committee's decision was arbitrary and capricious."), cert. denied, 110 S.Ct. 1924 (1990).
 
 III
 
 45
 Having determined that the "arbitrary and capricious" standard of review applies in this case, we must consider whether the plan administrator acted in an arbitrary and capricious way. Although the plaintiffs do not argue on this appeal that the plan administrator acted arbitrarily and capriciously by determining that the coke plant had not been permanently shut down, they do argue that the plan administrator's decision to deny benefits was arbitrary and capricious for three other reasons. First, Cyclops granted shutdown benefits to three employees who are claimed to have been similarly situated to the plaintiffs. Second, the administrator was allegedly acting under a conflict of interest. Third, the plaintiffs claim that the administrator breached a fiduciary duty owed to the plaintiffs.
 
 
 46
 * Section 12.2(g) of the pension plan states:
 
 
 47
 All discretionary acts which may be taken under this Section 12.2 by the Pension Board with respect to Employees, Participants, co-pensioners, spouses and beneficiaries shall be uniform and non-discriminatory in their nature in substantially identical situations.
 
 
 48
 In Varhola I, we noted that if Cyclops had discriminated against the plaintiffs in allocating pension benefits, then it would have been guilty of arbitrary and capricious behavior. 820 F.2d at 816.
 
 
 49
 We remanded in part because we could not determine from the record whether three employees to whom Cyclops had granted pension benefits (Allard Lawson, a Turn Foreman in the Maintenance Department; John R. Dalton, a General Foreman in the Maintenance Department; and Donald Pitts, a Foreman in charge of Fuel and Utilities in the Maintenance Department) "were indeed similarly-situated to at least some of the plaintiffs." Ibid. On remand, the district court determined that these three employees and the plaintiffs were not similarly situated:
 
 
 50
 John Dalton, Allard Lawson, and Donald Pitts received plant shutdown pensions because they experienced breaks in continuous service due to the permanent shutdown of the blast furnace and open hearth facilities.
 
 
 51
 Plaintiffs' break in continuous service was due to the sale of the coke works plant and was not related to the permanent shutdown of the blast furnace and open hearth facilities.
 
 
 52
 The plaintiffs contend that this finding lacks any evidentiary support and is clearly erroneous.
 
 
 53
 The plaintiffs claim that they introduced overwhelming evidence at trial that the three named employees (Dalton, Lawson, and Pitts) were similarly situated to them, and that Cyclops did not contradict this evidence. The plaintiffs rely on the testimony of William Cropper, the retired manager of Engineering and Construction at the Portsmouth facility. Cropper was in charge of Dalton, Lawson, and Pitts. Cropper testified that Dalton worked strictly in the coke plant. Cropper further testified that Lawson was transferred to the coke plant, sometime before 1980, after "they shut down the rolling mills." Cropper also testified that Pitts worked as a foreman in the steam plant, which continued to operate in conjunction with the coke plant and was sold to New Boston with the coke plant. Cyclops did not contradict Cropper's testimony that these three employees, who did receive pension benefits, worked exclusively at the coke plant or the steam plant for several years prior to 1980.
 
 
 54
 We find the evidence sufficient to support the finding that Dalton, Lawson, and Pitts experienced a break in their service at Cyclops due to the shutdown of the furnaces. Although those three men worked in the coke plant or the affiliated steam plant, they lost their jobs because of the corporate contraction that was necessitated by the shutting down of the furnaces. They were not on the select list of 28 salaried employees designated to stay on with Cyclops after it closed down the furnace operations in early 1980. After much of the operations at Portsmouth was eliminated, Cyclops faced having to consolidate its work forces from the various parts of the facility. Some of the better employees from the furnace operations, for example, were asked to remain during the period when only the coke plant was in operation; some of the less good employees at the coke plant, by contrast, were dismissed, despite the fact that their part of the facility--the coke plant--was still operating. The termination of the employment of Dalton, Lawson, and Pitts was therefore a direct result of the shutdown of the furnace operations. Furthermore, the lists of those employees who were designated to be laid off in early 1980 were prepared by operational personnel; the members of the Board had no input.
 
 
 55
 The plaintiffs were not terminated for the same reason as Dalton, Lawson, and Pitts. The plaintiffs were valued employees who made the short list of those needed to operate the coke plant. The end of their service with Cyclops came only after Cyclops sold the coke plant in November 1980, at which point the plaintiffs immediately assumed employment with New Boston. The district court's finding of no discriminatory behavior by Cyclops is, therefore, not clearly erroneous.
 
 B
 
 56
 The plaintiffs next claim that the Pension Board, as plan administrator, was acting under a conflict of interest that indicated an abuse of discretion. This claim is based on the fact that Cyclops candidly acknowledges that it saved $4.8 million dollars in pension liabilities by selling the coke plant. Since the members of the Board were officers of the company, they acted with an improper motive (that is, not with the interests of only the plan's beneficiaries in mind) in denying pension benefits to the plaintiffs. The plaintiffs argue that the Board's role as a fiduciary for the beneficiaries cannot be reconciled with its desire to act against the plaintiffs' interest.
 
 
 57
 The district court found that the Pension Board held a meeting on December 20, 1982 at which the Board determined:
 
 
 58
 that the coke plant was not permanently shutdown [sic] as contemplated in the Pension Plan, that no representation was made that Cyclops would guarantee the pension benefits of transferred employees for a period of more than five years and, therefore, that plaintiffs were not entitled to benefits from the Cyclops Salaried Plan.
 
 
 59
 [T]he Portsmouth coke works were never permanently shutdown [sic], but continued to operate and [ ] employees continued to work there without interruption through the sale of the coke works to New Boston; the Pension Board considered "permanent shutdown" in terms of the physical operation of the works, and not in terms of Cyclops' operation of the coke works.... [T]he procedures which otherwise would have been attendant to a permanent shutdown of a coke works were not undertaken, and the employees who were transferred suffered no interruption in employment.
 
 
 60
 We agree with the district court that "the fact that this decision resulted in an avoidance of financial liability associated with plant shutdown pensions for these 28 employees does not dictate a conclusion that it was the sole consideration or that it was an improper motive of the Pension Board." The court considered the contention of conflict of interest as one factor in deciding whether the Board acted arbitrarily and capriciously, but determined that other countervailing, legitimate factors dictated a finding of no abuse of discretion.
 
 
 61
 The plaintiffs have not shown that this finding constitutes clear error. Any alleged conflict of interest on the part of members of the Board is only one factor to be considered in determining whether the Board acted arbitrarily and capriciously. There is no evidence that the district court did not consider a possible conflict of interest as one factor; it simply found this factor outweighed by numerous other indicators of a good faith effort in making benefits determinations.
 
 
 62
 The plaintiffs' argument logically implies that no application for pension benefits can be determined by an employer-directed plan administrator. We believe that a faithful reading of ERISA does not support their argument. Neither the statute nor the Supreme Court case law, see Bruch, 109 S.Ct. at 956-57, prohibits this arrangement.
 
 C
 
 63
 The plaintiffs' final claim is that the Pension Board breached its fiduciary duties imposed under ERISA. The Board's decision, which could be interpreted as saving Cyclops millions of dollars in potential pension liabilities,[4] allegedly conflicts with its duty under 29 U.S.C. Sec. 1104(a)(1), which states that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries...." The plaintiffs claim that the Board breached this duty, and the district court clearly erred by finding otherwise. The plaintiffs buttress their argument by referring us to 29 U.S.C. Sec. 1103(c)(1), which provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries...." They claim that the savings in pension payments inured directly to the benefit of Cyclops's treasury.
 
 
 64
 The plaintiffs also allege that the Board violated its duty under 29 U.S.C. Sec. 1106(b), the self-dealing prohibition, which states:
 
 
 65
 A fiduciary with respect to a plan shall not--
 
 
 66
 (1) deal with the assets of the plan in his own interest or for his own account,
 
 
 67
 (2) ... act in any transaction involving the plan on behalf of a party ... whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries....
 
 
 68
 The Board's dual loyalties purportedly led it to violate Sec. 1106. It is the plaintiffs' position that the denial of benefits violated the statute and constituted arbitrary and capricious behavior.
 
 
 69
 This final claim must fail because we have already held that Cyclops did not violate the fiduciary duty provisions of ERISA. In Varhola I, we held that Cyclops did not engage in self-dealing. 820 F.2d at 818. Having already determined that Cyclops has no liability under Sec. 1106, we have no cause to reconsider that holding. For the foregoing reasons, we affirm the denial of pension benefits.
 
 IV
 
 70
 Cyclops cross appeals the award of severance pay. After having agreed with the plan administrator at trial that the plaintiffs were not arbitrarily denied pension benefits, the court summarily determined that the plaintiffs were entitled to severance pay benefits. Cyclops claims that this determination is unsupported by the record.
 
 
 71
 The district court offered no support for its one-sentence legal conclusion: "Plaintiffs' employment with Cyclops was terminated on November 21, 1980 and, therefore, plaintiffs are entitled to severance allowance as a matter of contract and pursuant to the terms of the severance pay program." It did not explain how the plan administrator acted arbitrarily and capriciously in denying severance pay.[5] We agree with Cyclops that the court's conclusion ignores the case law in this circuit and the plain language of the severance plan.
 
 
 72
 In Adcock v. Firestone Tire and Rubber Co., 822 F.2d 623, 627 (6th Cir.1987), a pre-Bruch case, we held that the denial of severance pay is appropriate where the sale of the plaintiffs' plant as a going concern does not result in the plaintiffs' unemployment. In Adams v. Avondale Industries, Inc., 905 F.2d at 950, we held that the unambiguous terms of a severance pay plan denied benefits to salaried employees who chose to remain after the sale of the facility to work for the acquiror corporation. Under those circumstances, the plaintiffs were not entitled to severance pay.[6]
 
 
 73
 The plaintiffs here are not entitled to severance pay because they do not meet the plan's eligibility requirements. Section 1.1 of the plan states that a full-time salaried employee is eligible for severance pay "if his employment is permanently terminated by the company, because of the curtailment, elimination or revision of the functions being performed by the employee." The district court did not find, and the plaintiffs did not allege, that the functions performed by the plaintiffs were eliminated by Cyclops. Rather, Cyclops terminated the plaintiffs because it sold the coke plant to New Boston, where the plaintiffs continued in the same roles they had occupied for Cyclops. Under these circumstances, the plan administrator did not act arbitrarily and capriciously in denying the plaintiffs severance pay.
 
 
 74
 Because ERISA affords the plaintiffs no relief, the denial of pension benefits is AFFIRMED, and the award of severance pay is vacated and REVERSED.
 
 
 
 *
 The Honorable William H. Timbers, Senior United States Circuit Judge for the Second Circuit, sitting by designation
 
 
 [1]
 The plaintiffs are former employees of the Cyclops Corporation or, in the case of one deceased plaintiff, a representative. The defendants are the Cyclops Corporation; the Pension Plan for Salaried Employees of Cyclops Corporation; William D. Dickey (Vice-President and Chief Financial Officer), Robert A. Kushner (Vice-President and General Counsel), and Donald E. Mitchell (Controller), the three individual members of the Plan's Pension Board (the "plan administrator" under ERISA); and the Program of Hospital-Medical Benefits for Eligible Pensioners and Surviving Spouses of Cyclops Corporation
 
 
 [2]
 In Varhola I, we held that the mistake the district court made the first time around was determining for itself on a motion for summary judgment that, in effect, there had been a permanent shutdown, rather than determining whether the plan administrator had drawn an arbitrary conclusion that there had not been a permanent shutdown
 
 
 [3]
 The Court in Bruch held:
 Thus, for purposes of actions under Sec. 1132(a)(1)(B), the de novo standard of review applies regardless of whether ... the administrator or fiduciary is operating under a possible or actual conflict of interest. Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "factor[ ] in determining whether there is an abuse of discretion." Restatement (Second) of Trusts Sec. 187, Comment d (1959).
 
 
 [109]
 S.Ct. at 956-57. Section 187 of the Restatement provides that "where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion."
 
 
 [4]
 The breach of fiduciary duty argument rests on the notion that Cyclops actually achieved a net financial gain by passing on pension liabilities to New Boston. However, it appears that New Boston likely assumed a liability equal to the one Cyclops surrendered ($4.8 million), New Boston may well have received from Cyclops some offsetting compensation (most likely in the form of a reduced purchase price). Under this scenario, Cyclops would not have saved money by having New Boston assume the pension liabilities. As noted in this section, even if it did save money, it did not violate ERISA
 
 
 [5]
 We believe that the terms of the severance pay plan grant the plan administrator sufficient discretion so that the "arbitrary and capricious" standard of review applies to the severance pay issue. Bruch, 109 S.Ct. at 956
 
 
 [6]
 Judge Guy noted in dicta that the only post-Bruch circuit opinion to face this issue "held that the sale of a going concern effected a 'termination' of employment requiring payment of severance benefits. Ulmer v. Harsco Corp., 884 F.2d 98, 104 (3d Cir.1989)." Adams v. Avondale Industries, Inc., 905 F.2d at 950 n. 3. In Ulmer, however, the severance pay plan obligated the company to make severance payments to employees who could not be provided "continuing employment." The court determined that "continuing employment" meant employment with the company, not with the buyer of the division in which the employees worked. The Ulmer court was not persuaded by the reasoning of other cases that reached the opposite conclusion, because "many of these cases involve plans that give their administrators significantly more discretion than did the plan at issue here." 884 F.2d at 104. Ulmer, therefore, can be distinguished from this case by the explicit discretion that the Cyclops severance pay plan gave the plan administrator in determining who is eligible for benefits