Glen H. SENGPIEL, et al., Plaintiffs,

v.

The B.F. GOODRICH COMPANY, et al., Defendants.

No. 5:96–CV–0316.

United States District Court, N.D. Ohio, Eastern Division.

June 30, 1997.

John L. Wolfe, Akron, OH, for Plaintiffs.

James A. Rydzel, Jones, Day, Reavis & Pogue, Cleveland, OH, Kevin D. O'Rear, Baker & Daniels, South Bend, IN, Theodore E. Laszlo, Richfield, OH, for B.F. Goodrich Co., B.F. Goodrich Pension Plan, B.F. Goodrich Life Ins., B.F. Goodrich Hospital–Surgical–Medical Basic Plan, B.F. Goodrich Prescription Drug Benefit Plan, B.F. Goodrich Major Medical Plan.

Norman S. Jeavons, Ronald S. Okada, John J. McGowan, Jr., Baker & Hostetler, Cleveland, OH, Theodore E. Laszlo, Richland, OH, for Uniroyal Goodrich Tire Co., Uniroyal Goodrich Pension Plan, Uniroyal Goodrich Tire Co. Health Care Plan, Uniroyal Goodrich Tire Co. Prescription Drug Plan, Uniroyal Goodrich Tire Co. Life Ins. Plan, Michelin North America, Inc.

*MEMORANDUM OPINION*

DOWD, District Judge.

TABLE OF CONTENTS

I. INTRODUCTION .... 1326

II. FACTUAL BACKGROUND .... 1326

A. The Parties .... 1326
B. The Employee Benefit Plans .... 1326
C. The Transfer to UGTC .... 1328
D. UGTC's 1995 Change in Benefits .... 1330
E. The Claims .... 1330

III. SUMMARY JUDGMENT STANDARD .... 1331

IV. DISCUSSION .... 1332

A. Introduction .... 1332
B. The Transfer Was Not a Fiduciary Act .... 1333
C. Plaintiff's ERISA Contract-Based Claim .... 1336
1. Vesting of Welfare Benefits .... 1336
2. Reference to Extrinsic Evidence .... 1338
3. In Any Event, Extrinsic Evidence Would Not Help the Plaintiffs .... 1338
4. The Ong Letter .... 1341
D. UGTC/Michelin's Motion for Summary Judgement .... 1342

V. CONCLUSION .......................................................... 1342

## I. INTRODUCTION

The plaintiffs, salaried retirees of the B.F Goodrich Company ("BFG"), bring this action under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"). They challenge the 1985 transfer of their retirement benefits to a newly formed company, the Uniroyal Goodrich Tire Company ("UGTC") and subsequent reductions in those benefits by UGTC and its successor in interest, Michelin North America Inc. ("Michelin"). Named as defendants are BFG, UGTC, Michelin, and the employee welfare benefit plans sponsored by BFG and UGTC/Michelin. The defendants have filed motions for summary judgment, and the matter has been briefed extensively and well by all parties. For reasons set forth below, the Court grants the motions for summary judgment and will publish a judgment entry dismissing the case.

## II. FACTUAL BACKGROUND

### A. The Parties

Glen H. Sengpiel retired from BFG on December 1, 1976. At the time of his retirement he was Corporate Director of Employee Relations. (Sengpiel affid. at ¶ 1). Donald R. Gottschalk was Corporate Employee Relations Representative at the time of his retirement on January 1, 1982. (Gottschalk depo. at 13). Donald E. Kelly was a foreman in plant cleaning for BFG's Akron Main Street facilities when he retired on July 1, 1982. (Kelly depo. at 10, 14). These plaintiffs purport to represent a class of similarly situated BFG salaried retirees.[1] (Amended Complaint [Docket No. 26] at ¶¶ 8–14).

Defendants are 1) BFG and its benefit plans: the B.F. Goodrich Pension Plan, the B.F. Goodrich Life Insurance Plan, the B.F. Goodrich Hospital–Surgical–Medical Basic Plan, the B.F. Goodrich Prescription Drug Benefit Plan, and the B.F. Goodrich Major Medical Plan; 2) UGTC and its benefit plans: the Uniroyal Goodrich Pension Plan, the Uniroyal Goodrich Tire Company Health Care Plan, the Uniroyal Goodrich Tire Company Prescription Drug Plan, and the Uniroyal Goodrich Tire Company Life Insurance Plan, and 3) Michelin, as UGTC's successor in interest.

### B. The Employee Benefit Plans

A few months prior to Sengpiel's retirement, he received a document detailing pension and benefit levels, among which was a benefit of $25,000 in life insurance. The calculations were followed by a section entitled "Employee's Release" and stating in relevant part:

> I have read and understand the above calculation and agree to accept the payments of Total Monthly Pension in the amount set forth above, in settlement of my rights under all B.F. Goodrich Employee Benefit Programs applicable to me, subject, however, to all future reductions permitted in accordance with the provisions of the Company's Pension Program applicable to me; and in consideration of such payments, I hereby release and forever discharge the Company from any other obligations under its present or future Employee Benefit Programs except for payments of future premiums on my adjusted Group Life Insurance and payment of Hospitalization Program benefits to the extent described in such applicable Programs....

(Sengpiel affid. Exh. A). Sengpiel testified that prior to his retirement he was given a notebook entitled, "Design for Protection: B.F. Goodrich Salaried Benefit Program." The notebook included sections entitled, "The B.F. Goodrich Hospitalization and Surgical Program," "The B.F. Goodrich Major Medical Insurance Plan," "The B.F. Goodrich Life Insurance Plan," "The B.F. Goodrich Pension Plan," and "The B.F. Goodrich Prescription Drug Benefit Plan." Each section was a dozen or more pages long and contained descriptions of benefits provided under the plan. The sections were written prior to ERISA and therefore were not Summary Plan Descriptions as that term is defined under

1. At a status conference on August 7, 1996, the Court announced it would defer consideration of whether to certify a class until dispositive motions were fully considered.

ERISA. With the exception of the major medical plan, BFG did not expressly retain the right to modify or discontinue the benefits offered.[2]

In 1977, in conformance with the newly enacted ERISA, BFG prepared Summary Plan Descriptions ("SPDs") for each of its plans. It distributed the SPDs to all salaried and wage employees in a vinyl portfolio.[3] The first booklet in the portfolio was entitled "Highlights" which summarized the benefits available to employees. The first paragraph of the Highlights booklet stated:

> This brochure highlights some of the benefits available to BFGoodrich Salaried employees. If there is any conflict between the brief descriptions presented here and the formal plans themselves, the latter will govern in all cases. While the Company expects to continue these benefits indefinitely, it reserves the right at its option to change or discontinue any or all of the programs at any time.

(Exh. 3 to affid. of BFG's Gary Habegger). Although the Highlights booklet contained this "reservation of rights" clause, none of the individual SPDs contained similar language through which the company reserved the right to change or discontinue the plans.

Sengpiel had been retired for a few months when the packet containing the plan descriptions and the Highlights booklet was distributed. However, he testified that as corporate director of employee relations he was aware of the language in the Highlights booklet prior to his retirement. (Sengpiel depo. at pp. 30–33).

The portfolio of SPDs was revised in 1981, and new SPDs, including a new Highlights booklet containing the same reservation of rights clause, were distributed to all salaried employees that year. (Affid. of Gary Habegger, vice president of human resources for BFG, at ¶ 4). Again, none of the accompanying SPDs contained a reservation of rights clause.

Habegger testified that Gottschalk and Kelly, along with other active BFG employees, would have received the 1977 and 1981 SPDs and Highlights booklets. (Habegger affid. at ¶¶ 3–4). The plaintiffs do not dispute the creation or distribution of the SPDs or the Highlights booklet. Kelly says he probably received the documents Gottschalk said he does not remember whether or not he received them. (Kelly depo. at 14–15; Gottschalk depo. at 25–27).

At the time of their retirements in 1982, Kelly and Gottschalk authorized a deduction from their pension payments for a portion of their $25,000 life insurance benefit. BFG paid for the first $10,000 of life insurance; Kelly and Gottschalk financed the additional $15,000 at a monthly rate of 35 cents per $1,000 as provided in the plan. (Gottschalk affid. Exh. C).

In 1986 BFG sent salaried retirees an updated SPD on the BFG Health Care Plan. The booklet was revised because of changes in the plan effective May 1, 1986.[4] The SPD contained the disclaimer, "The BFGoodrich Company expects to continue the Health Care Plan indefinitely but reserves the right to amend, suspend or terminate the Plan at

2. The major medical plan contained the language, "It is hoped that BFG can offer the Major Medical Expense Insurance indefinitely, but, as is customary in Group Insurance Plans, the right to change or discontinue the Plan at any time must be reserved." (Plan at p. 18). On the other hand, the hospitalization and surgical plan contained no such express reservation. In a section entitled "Coverage for Retirees," the plan stated, "Employees who retire and who are eligible for a pension will be eligible for coverage The benefits for a retiree will be the same for him and his eligible dependents as when actively employed.... The surviving spouse of a retiree who at the date of the retiree's death was covered, will continue to be covered until the earlier of the date of death or remarriage." (Sengpiel affid. at Exh. B–1 at p. 11). The prescription drug benefit plan simply stated that coverage would terminate when coverage under the hospitalization plan terminated. (*Id.* at Exh. B–6 at p. 8). The life insurance plan allowed retirees to keep up to $25,000 in life insurance, with the company paying for $10,000 of the insurance and the retiree paying the balance at a rate of 35 cents per $1,000 of insurance, the same rate as paid prior to retirement. (Sengpiel affid. at Exh. B–4 at p. 9).

3. BFG submitted an original version of the vinyl portfolio to the Court (Docket No. 92).

4. Changes included requirements for second opinions for certain surgical procedures. The new SPD also incorporated changes made to the plan in 1984 and 1985. (Habegger affid. Exh. 4).

any time." Other than the pre-ERISA major medical plan summary, this was the first time an *individual summary plan description* contained the reservation of rights language.

*C. The Transfer to UGTC*

In early 1986, BFG and Uniroyal reached an agreement in principle in which each company would spin off its entire tire operations into a joint venture, the Uniroyal Goodrich Tire Company, to be owned in equal parts by BFG and Uniroyal. The plan called for the assets and liabilities of each company's tire business to be combined into the new joint venture. The liabilities included the pension and welfare benefit obligations to tire-related retirees. Pursuant to ERISA requirements, BFG transferred funds sufficient to support its pension obligations to the transferred retirees. BFG did not transfer any funds to support the welfare benefits of the transferred retirees.[5]

The provision in the joint venture agreement ("JVA") regarding employee benefit plans required UGTC (referred to as "the Partnership") to

> establish and adopt welfare plans which are comparable, taken as a whole, to the welfare plans ... of Goodrich and Uniroyal which cover employees of the Uniroyal Tire Business and the Goodrich Tire business that will be hired by the Partnership. [The Partnership] shall assume all liability of Goodrich and Uniroyal for benefits under their present or past welfare plans or those of their predecessors for active, former and retired employees of the Goodrich Tire Business or the Uniroyal Tire Business.

(JVA at § 8.4).

In addition to transferring liability for the pension and welfare benefits of retirees who worked in the tire division, BFG decided it was necessary to transfer the benefits of a percentage of retirees who did not work directly for its tire division, but instead worked on the company's corporate staff. That staff included many retirees whose responsibilities involved both tire and non-tire operations throughout their careers. BFG's chief executive officer, John Ong, testified at deposition that the *corporate structure* of both venture partners (BFG and Uniroyal) was similar:

> [W]hile our tire businesses were organized as so-called divisions of the company, both of us maintained a fairly substantial corporate organization and a lot of the required administrative functions relating to the tire business were performed not by people in the Uniroyal Tire Division or BFGoodrich Tire Division, but by our corporate staffs.
>
> We had a company-wide accounts receivable department and company-wide accounts payable. We had a union relations department, for example. Those employees were all so-called corporate employees....
>
> Both companies felt that they wanted to transfer all the assets and all the liabilities of their respective tire businesses. The assets were fairly straightforward in terms of plants, special equipment and so on, and active work force. The liabilities, of course, included among other things, pension liabilities. And it was the intention during the negotiations, of which I was the principal negotiator, from the outset that we would transfer the liability of everybody who had had an economic impact on the tire business of the respective companies at that time.

(Ong depo. at 7–8). Ong testified further that "there was no way, given the nature of the records that we had of retirees," to determine how much work each individual corporate retiree had done for the tire division. (*Id.* at 22). However, the company did have a "very precise allocation system" in which the company "charged off or allocated the cost of most of those corporate departments to the various business divisions which they served, tire group; chemical group; aerospace division; and so forth." (*Id.* at 23). BFG decided to use the allocation system to determine "what percent of our so-called corporate effort had been, in effect, part of our tire business." (*Id.* at 24). In this manner,

5. ERISA has no provision requiring transfer of assets to accompany transferred welfare benefit plans. BFG did not use a trust fund to pay welfare benefits, instead paying those benefits out of current revenues.

BFG determined that 42.54 percent of the corporate effort had been devoted to the tire business. Accordingly, BFG decided to transfer 42.54 percent of its corporate retirees to the retiree rolls of the newly-formed UGTC.

BFG elected a simple method of determining which corporate retirees would be transferred: anyone with a Social Security number ending in 4254 or lower was selected.[6] Because the Social Security numbers of Sengpiel, Kelly and Gottschalk fall in that category, they were among 420 corporate retirees transferred to the new company for purposes of administration and provision of pension and welfare benefits. The retirees were notified of the transfer by letter dated June 6, 1986, signed by Albin E. Ulle, BFG's vice president for human resources. After explaining that the transferees had been chosen by "random selection based upon Social Security number," the letter discussed the impact of the transfer on retirement benefits:

> It is important for you to understand that when you become covered by the Uniroyal Goodrich programs, the amount of any pension benefits you may be receiving will not be changed or reduced in any way. The terms and conditions of the payment of those benefits likewise will not change. This is assured by Federal law. Assets required to pay benefits to which you are entitled will be transferred from BFGoodrich to Uniroyal Goodrich.
>
> Likewise, your assignment to the Uniroyal Goodrich retirement rolls means that current life insurance and medical benefits programs for which you may now qualify will be continued, with the understanding that, as in the past, certain provisions may be changed in the future in accordance with the plans.

(Def. Exh. G).

A number of retirees protested the transfer. Gottschalk wrote to Ulle, questioned the legal basis for making such a transfer, and said, "I am certain we will receive no improvements due to the change and probably can look forward to further cuts as have been occurring." (UGTC/Michelin Exh. D). Sengpiel and Kelly registered their protests in direct conversations with Ong. Both testified Ong assured them they would be treated no differently than corporate retirees remaining on BFG's books. (Sengpiel depo at 39; Kelly depo. at 19).

In 1987, BFG decided to sell its interest in UGTC to Clayton & Dubilier, a private investment firm. This transaction set off another flurry of protests from BFG retirees. Several contacted Ong directly. Ong responded by letter to Gottschalk and several other retirees. (BFG Exh. J). Ong stressed that the pension obligations had been funded by BFG prior to transfer and that additional steps had been taken to prevent UGTC's pension fund from being diluted. He then discussed the status of the welfare benefit plans in the following excerpt which has been a major source of controversy in this litigation:

> Turning now to your concerns regarding your retiree medical benefits and the continuance of your life insurance. Retiree medical and life insurance benefits are not paid from a trust fund but are paid from current revenues. You are correct that UGTC has undertaken the primary obligation to provide you with these benefits. We are confident that Uniroyal Goodrich will continue to be a major factor in the North American tire business and will continue to discharge its obligations to you. I can assure you that, although the obligation to pay these benefits is with UGTC, you may properly look to Goodrich to satisfy the rights you enjoy pursuant to the retiree medical benefits plan and the retiree life insurance plan in the unlikely event UGTC fails to provide them.
>
> Those rights are, of course, as described in written plans and you should understand that nothing that I have expressed in this

6. BFG's Habegger testified he never calculated whether this method of selection actually resulted in approximately 42.54 percent of the retirees being transferred. (Habegger depo. at 31). Records provided by an expert hired by the plaintiffs indicated that 420 out of 1,024 potential retirees, or 40.93 percent, were transferred. (Report of Richard L. Einsporn, Docket No. 96). There is no explanation why BFG did not attempt to make an adjustment to ensure that the desired number of retirees, or 42.54 percent, was transferred to the UGTC rolls.

letter is intended to alter any plan or expand any of those rights, and I do not intend by this letter to imply that the right to amend those plans is waived. Similarly, however, nothing in the assumption of liability by UGTC is intended to diminish such rights as you may have under those plans or to prevent you from looking to Goodrich to honor them if UGTC fails to do so.

(BFG Exh. J). Gottschalk testified that the letter allayed his concerns and convinced him not to try to organize his fellow retirees into filing a class action lawsuit against BFG. (Gottschalk depo. at 63–64).

The plaintiffs allege that the existence of an indemnification agreement between BFG and UGTC, executed at the time of the creation of the joint venture, is evidence that BFG never intended to make good on any failure by UGTC to provide benefits. In the agreement, entitled "Assumption of Liabilities and Indemnification Agreement Relating to the Goodrich Tire Business," UGTC agreed to indemnify and hold BFG harmless from any liability associated with BFG retirees who were transferred to the UGTC retirement rolls. (Exh. D attached to affid. of John Wolfe). The plaintiffs allege that this agreement insulated BFG from any liability associated with its former retirees and rendered Ong's promise illusory.

In 1990 BFG amended its pension and welfare benefit plans for retirees. The changes included 1) an increase in the deductible amount from $100 to $150 per year for individuals and from $200 to $300 per year for families, and 2) an increase in the pension of $40 per month. The plaintiffs were not impacted by these changes because they had been transferred to the rolls of UGTC. Thus since 1990 there has been a difference between the benefits received by retirees on the BFG plans and retirees on the UGTC plans.

*D. UGTC's 1995 Change in Benefits*

In 1995, retirees on the UGTC plans, including the plaintiffs, received cuts in the welfare benefits provided to them. Specifically, 1) UGTC would no longer reimburse retirees and their spouses for their monthly Medicare premium; 2) medical and prescription drug coverage, previously provided at no charge, would cost each retiree $10 per month for individual coverage and $40 per month for family coverage; 3) annual deductibles increased from $100 to § 150 per individual and $200 to $300 per family; 4) the annual co-payment maximum, formerly $450 per individual and $550 per family, increased to $1,000 regardless of the number of individuals covered; 5) coordination with Medicare benefits changed in a manner such that benefits were always calculated under the assumption the retirees had Medicare coverage; and 6) life insurance coverage was reduced from a maximum of $25,000 to $5,000. (Amended Complaint at ¶ 39 and Attachment).

Again, retirees who formerly had been covered under BFG plans complained. Ong responded in writing to the retirees, informing them he had registered their concerns to the chief executive officer of UGTC but telling them BFG was powerless to force UGTC to make changes. Ong also said in the letter that the increases in deductible and co-payments were the same increases imposed by BFG on its retirees in 1990.[7] (BFG Exh. K). Ong wrote to the former BFG retirees a few months later and informed them that UGTC had told him it stood by its decision to reduce welfare benefits. (BFG Exh. L).

*E. The Claims*

The plaintiffs' amended complaint, pleaded under the broad parameters of ERISA, is not broken down into specific causes of action. It does provide a detailed recitation of

7. The record supports Ong's statement that BFG's deductibles had been raised in 1990 to the level UGTC began to charge in 1995. However, the record is unclear on whether the co-payment maximum of $1,000 had been raised as well. Ong testified that the $1,000 maximum was in effect (Ong depo. at 76–77). Sengpiel answered in the affirmative when asked if he knew BFG's plans had the same "deductible and co-pay" as UGTC. (Sengpiel depo. at 36). However, the Court is unable to find evidence in any of the SPD's or any letter from BFG announcing an increase in co-payment maximum from the $450 per individual and $550 per family as articulated in its 1986 SPDs.

factual and legal allegations, including a) at the time of their retirement, the plaintiffs were promised that their pension and welfare benefits would be paid by BFG (¶ 15); b) because the they were not employed in BFG's tire division, they never should have been transferred to the retirement rolls of UGTC (¶ 19); c) the transfer could not lawfully have been made without their consent (¶ 26); and d) reliance on the pledges in Ong's 1988 letter tolled the statute of limitations on this action (¶ 30).

Paragraph 11 of the amended complaint frames the issues the plaintiffs seek this Court to resolve: 1) whether BFG breached its fiduciary duty to the plaintiffs by transferring them to the UGTC rolls through "the arbitrary use of [their] Social Security numbers"; 2) whether BFG could transfer the retirees without their consent; 3) whether BFG is still primarily liable to the plaintiffs for their pension and welfare benefits no withstanding the transfer; 4) whether, if BFG is not primarily liable, it is secondarily liable and required to pay the difference between the plaintiffs' reduced benefits and the benefits currently provided by BFG to its retirees; 5) whether the assignment of ERISA-related obligations to UGTC was arbitrary, capricious and in violation of the plaintiffs' ERISA rights; and 6) whether the transfer of the plaintiffs to the UGTC rolls should be rescinded and set aside.

The plaintiffs seek the following relief: 1) a judgment ordering BFG to "reassume and be responsible to" the plaintiffs for welfare benefits 2) a judgment ordering BFG to pay the additional costs incurred by the plaintiffs due to the 1995 decreases in coverage; 3) a judgment ordering UGTC/Michelin to transfer the plaintiffs back to the retirement rolls of BFG; and 4) other unspecified appropriate equitable relief and attorney fees.

BFG has asserted a cross-claim against UGTC/Michelin based upon the indemnification agreement described on pages 1328–1329 *supra*. That cross-claim is not at issue.

### *III. SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). *See, e.g., U.S. v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir.1985) and cases cited therein. The Court's favorable treatment of facts and inferences, however, does not relieve the nonmoving party of the responsibility "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party satisfies his or her burden to show an absence of evidence to support the nonmoving party's case, *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2552, the party in opposition "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Although the showing required of the nonmoving party by Rule 56 does not go so far as to require that all opposition evidence be in a form admissible at trial, the rule does require the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves...." *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. General averments or conclusory allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990). Furthermore, unsworn statements and affidavits composed of hearsay and non-expert opinion evidence, "do not satisfy Rule 56(e) and must be disregarded." *See Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968–69 (6th Cir.1991)

(quoting *State Mutual Life Assurance Co. v. Deer Creek Park*, 612 F.2d 259, 264 (6th Cir.1979) and citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 1608 n. 17, 26 L.Ed.2d 142 (1970)). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts ... earlier deposition testimony." *Reid v. Sears Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (citing *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir.1984)).

On a motion for summary judgment, the Court will consider "[o]nly disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. Non-material facts will not be considered. Neither will the judge attempt to weigh the material evidence or determine its truth. *Anderson v. Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510. The judge's sole function will be to determine whether there is a genuine issue for trial such that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (citations omitted).

Where the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2552 (equating the standard for a directed verdict under Rule 50(a) with the summary judgment standard of Rule 56). If the evidence is "merely colorable," or is "not significantly probative," the Court may decide the legal issue and grant summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (per curiam) and *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. at 2511.

## *IV. DISCUSSION*

### *A. Introduction*

ERISA's civil enforcement provision, 29 U.S.C. § 1132(a), reads in relevant part as follows:

> A civil action may be brought—
>
> (1) by a participant or beneficiary—
>
> . . . . .
>
> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
>
> . . . . .
>
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan; ....

As detailed in their amended complaint and shown clearly in their prayer for relief, *see* page 1331, *supra*, the gravamen of the plaintiffs' challenge is that their transfer to the retirement rolls of UGTC was a breach of BFG's fiduciary duty to them, owed by virtue of 29 U.S.C. § 1104.[8] This states a cause of action under 29 U.S.C. § 1132(a)(3) quoted above.

The Court finds this to be an extraordinarily difficult case. Despite the parties' best efforts to convince the Court otherwise, the Court believes no case law is precisely on point with respect to several of the key is-

8. 29 U.S.C. § 1104 is quoted at page 1333 *infra*.

sues. Thus analysis is guided by comparison to other cases by analogy, always keeping in mind the policy implications guiding the authors of ERISA.

After careful study of the undisputed facts in light of ERISA and the applicable case law, the Court is of the view that BFG's transfer of the plaintiffs to the UGTC retirement rolls for purposes of providing pension and welfare benefits was not a fiduciary act. Thus the act could not have amounted to a breach of any fiduciary duty owed by BFG to the plaintiffs. Summary judgment will be awarded with respect to breach of fiduciary duty claim.[9]

The plaintiffs' contract claims present even more difficult issues. After extensive deliberation on the matter, the Court's contract-based analysis will proceed as follows: 1) BFG's attempt to import the reservation of rights clause from the Highlights booklet into all of the accompanying SPDs is unpersuasive; thus the SPDs are deemed not to have a reservation of rights clause; 2) nonetheless, the plaintiffs fail to sustain their burden of showing that the SPDs reflect an intent that welfare benefits would be guaranteed for life; and 3) even if the Court were to construe the SPDs as ambiguous, permitting the consideration of extrinsic evidence, the weight of the evidence does not support the plaintiffs' claim of vesting.

### B. *The Transfer Was Not a Fiduciary Act*

ERISA sets forth the fiduciary responsibility with respect to employee benefit plans at 29 U.S.C. §§ 1101–1104. The statute requires the following standard of care:

> [A] fiduciary shall discharge his duties *with respect to a plan* solely in the interest of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that; prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; ....

29 U.S.C. § 1104(a)(1) (emphasis added). The threshold issue for the plaintiffs' breach of fiduciary duty claim is to show that the spinning off of 42.54 percent of BFG corporate retirees into UGTC constituted a "fiduciary" act for purposes of ERISA.

ERISA defines the word "fiduciary" precisely. The statute states in relevant part:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... or (iii) he has any discretionary authority or discretionary responsibility in the management of such plan.

29 U.S.C. § 1002(21)(A). Courts have relied closely upon that definition when analyzing whether a particular act is a "fiduciary" act for purposes of ERISA.

In light of the above-quoted statutory provisions, when determining whether fiduciary obligations attach to the activities related to welfare benefits plans, courts have interpreted ERISA to distinguish between

9. An issue not developed by the parties but spotted by the Court is whether the plaintiffs could recover at all in their individual capacities even if they were successful in proving a breach of fiduciary duty theory. The plaintiffs contend that BFG's transfer of their benefits constituted "a breach of the fiduciary duties that BFGoodrich *owed to its salaried Corporate retirees.*" (Amended Complaint at ¶ 26 [emphasis added]). However, the Supreme Court has made clear that the fiduciary duties created under ERISA are owed to *the plan* and not to the *plan participants. Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 140, 105 S.Ct. 3085, 3089, 87 L.Ed.2d 96 (1985). *See also Vespasian v. Sweeney,* 52 F.3d 327 (table), 1995 WL 154982 (6th Cir.1995) (ERISA "permits recovery by or on behalf of a plan—but does not permit recovery by an individual beneficiary—for a breach of fiduciary duty") (citing *Russell*). The Court is reluctant to dispose of this case on a case not briefed by the parties and has no need to do so, given the analysis hereinafter.

the "administration" of such plans and the "establishment," "amendment," or "termination" of the plans. Although an employer "clearly must satisfy fiduciary duties when *administering* benefit plans, it is equally plain that simply because an employer is also a benefits plan administrator, ERISA does not require that day-to-day corporate business transactions, which may have a collateral effect on prospective, contingent employee benefits, be performed solely in the interest of plan participants." *Adams v. Avondale,* 905 F.2d 943, 947 (6th Cir.), *cert. denied,* 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990) (emphasis added) (quotation and citations omitted).

The Supreme Court cited the Sixth Circuit's *Adams* case when announcing a succinct rule in *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 1228, 131 L.Ed.2d 94 (1996): "Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans."

There is no question that the statutory scheme of ERISA treats pension plans quite differently from welfare benefit plans. Pension plans are subject to strict funding, vesting and termination regulations, none of which are present with respect to welfare benefit plans. Discussing the legislative history underlying ERISA,, *Adams* noted:

> Although Congress considered imposing vesting requirements on welfare benefits, it decided to limit vesting to pension plans in order to keep costs within reasonable limits. Apparently, Congress chose not to impose vesting requirements on welfare benefit plans for fear that placing such a burden on employers would inhibit the establishment of such plans. In drawing the line between employer actions subject to the fiduciary duty requirement and those not, we must avoid any rule that would have the effect undermining Congress' considered decision that welfare benefit plans not be subject to a vesting requirement. We are compelled, therefore, to reject plaintiffs' proposed rule that welfare benefit plans such as the one before us be amended or terminated only when such action would be in the best interests of the employees.... Instead, we employ the rule ... that a *company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan.*

*Id.* at 947 (emphasis added) (quotation and citation omitted). *See also Musto v. American General Corp.,* 861 F.2d 897 (6th Cir. 1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989) ("The case law, in any event, makes it clear that when an employer decides to establish, amend, or terminate a benefits plan, as opposed to managing any assets the plan and administering the plan in accordance with its terms, its actions are not to be judged by fiduciary standards"); *Lockheed Corp. v. Spink,* — U.S. —, —, 116 S.Ct. 1783, 1789, 135 L.Ed.2d 153 (1996) ("Because the defined functions in the definition of fiduciary do not include plan design, an employer may decide to amend an employee benefit plan without being subject to fiduciary review") (quotation omitted).

Citing the foregoing authority, the defendants argue that BFG's decision to transfer the plaintiffs and other salaried retirees to the retirement rolls of UGTC did not involve plan "administration" or "management" as those terms are construed under ERISA and thus did not constitute a fiduciary act under ERISA. The Court agrees.

It appears to the Court that the cases and the statute provide a fairly clear delineation of what does nor does not constitute a fiduciary act. As summarized in *Adams, supra,* establishing, amending or terminating a benefits plan is *not* a fiduciary act, while "managing ... assets of the plan and administering the plan in accordance with its terms" is a fiduciary act. *Musto,* 861 F.2d at 897. The fiduciary responsibility is tied to plan management and administration.

To some extent, spinning off members of a plan is *sui generis;* it falls easily into no category. Neither side has provided a case precisely on point. Keeping in mind the case law arising out of ERISA and the limited definition of "fiduciary" in the statute, the Court essentially must choose whether the spinoff is more akin to 1) amending, modifying or terminating the then-existing plans (in which case it would not be a fiduciary act), or

2) managing or administering those plans (in which case it would be a fiduciary act).

Although the analogy is not perfect, the Court is of the view that the spinoff at issue is more appropriately characterized as a modification or termination of the plans, at least with respect to the affected employees, than it is characterized as management or administration of those plans. The spinoff involved neither managing nor administering the welfare benefit plans; rather, the spinoff was a major business decision, i.e., a "corporate business transaction[ ] which [had] a collateral effect on prospective, contingent employee benefits." *Adams,* 905 F.2d at 947.

Because the issue is unique, the Court must make its decision with little citation to direct authority. However, an overall reading of the cases, from both the Supreme Court and the Sixth Circuit, reveals certain themes, such as 1) fiduciary responsibilities under ERISA were limited intentionally by Congresses; 2) employers/administrators are generally free to amend, modify or terminate welfare plans; and 3) the public policy rationale behind limitation of welfare benefit plan regulation, i.e., excessive regulation would be a disincentive to providing such plans, compels a constrained evaluation of what constitutes a fiduciary function.

For these reasons the Court holds that BFG's decision to transfer the plaintiffs to the UGTC rolls as part of creation of the joint venture was not a fiduciary, act under ERISA. Thus the claim of breach of fiduciary duty fails. However, even if the Court were to have found that the transfer was a fiduciary act, it would find further that BFG violated no fiduciary duty in making the transfer. Transferring a proportionate share of corporate retirees to the new entity was a reasonable outgrowth of the corporate decision to start a new business venture. Basing the selection process on Social Security numbers was as fair and as random as any other method. BFG complied with federal law respecting transfer of assets to meet pension obligations [10] and secured a promise from UGTC to provide "comparable" welfare benefits. (Joint Venture Agreement at § 8.4).[11] This distinguishes the case from *Howe v. Varity Corp.,* 36 F.3d 746 (8th Cir.1994), *aff'd on other grounds,* —— U.S. ——, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), relied upon by the plaintiffs, in which the employer was found to have breached its fiduciary responsibility to the plaintiffs by shifting them to a newly formed company which was known to be bankrupt from its inception. The plaintiffs in this case do not even allege, much less prove, bad faith on the part of BFG at the time it created UGTC. and bad faith was an element of the breach of fiduciary claim in *Howe.*[12]

10. Although the plaintiffs occasionally couch their complaint in terms of both pension and welfare benefits, there is no real controversy regarding the pension plans. There has been no reduction in pensions for UGTC retirees. It is true that retirees remaining on BFG rolls received a $40 per month pension increase in 1991, at the same time health insurance deductibles rose for those same retirees while remaining stable for UGTC retirees. The plaintiffs sought no legal redress at that time. Although plaintiffs now claim entitlement to the monthly increase retroactive to 1991, it is clear that there is no entitlement to non-vested pension increases following transfer from a plan. *Dougherty v. Chrysler Motors Corp.,* 840 F.2d 2, 3 (6th Cir. 1988) (employer has no fiduciary duty to guarantee future, nonvested benefits) (citing cases). So long as the transfer itself was legal (which the Court holds today), the defendants had no duty under ERISA to provide future benefits increases to the transferees.

11. While effectively conceding BFG has the right to amend the benefit plans, the plaintiffs argue that such a right did not transfer to UGTC. They claim no document expressly conferred such a right on UGTC. The plaintiffs essentially argue that UGTC was the provider of *BFG's* benefits. However, no fair reading of the agreement between BFG and UGTC could lead to any other conclusion than that the new benefit plans were UGTC's and not BFG's. The relevant section of the Joint Venture Agreement stated that the new entity would *"establish* and adopt welfare plans which are *comparable,* taken as a whole, to the welfare plans ... of Goodrich and Uniroyal." (JVA at § 8.4) (emphasis added). This implies far more than merely being a caretaker for BFG's plans. Based on the record, it is not reasonable to infer that UGTC, as a separate legal entity "establishing" its own "comparable" plans, would be bound by BFG's decisions in its own separate plans.

12. Tellingly, *Howe* stated that the mere "decision to create [a new company] and to transfer certain assets to it, for example, was *not* by itself a violation of ERISA. It may have been unwise or

*C. Plaintiffs' ERISA Contract-Based Claim*

In addition to the breach of fiduciary duty claim, the plaintiffs also assert that the defendants are liable under a contract-based ERISA theory for failing to provide benefits as promised at the time of retirement. Such an argument can be successful only if the plaintiffs can show that their benefits vested at retirement at the level of coverage they are now claiming. The plaintiffs allege that the SPDs confer vesting and that evidence outside the SPDs further evinces the intent of the parties that their welfare benefits would be vested.

*1. Vesting of Welfare Benefits*

As discussed previously, ERISA welfare benefits are not presumed to have vested. "Until benefits have vested, employers may modify or terminate them, *whether or not they have reserved the right to do so.*" *Helwig v. Kelsey-Hayes Co.*, 93 F.3d 243, 248 (6th Cir.1996), *cert. denied*, — U.S. —, 117 S.Ct. 690, 136 L.Ed.2d 613 (1997) (emphasis added) (citing *Curtiss-Wright*, 514 U.S. at 78, 115 S.Ct. at 1228). Thus the plaintiffs can prevail only if they can establish an agreement that welfare benefits provided by BFG would vest, i.e., could never be reduced.

In determining whether the parties have contracted for welfare benefits, a court "must look to the intent of the parties and apply federal common law of contracts to determine whether welfare plan benefits have vested." *Gill v. Moco Thermal Indus., Inc.*, 981 F.2d 858, 860 (6th Cir.1992). The inquiry starts with the plan documents themselves. Under ERISA, an employee benefit plan must be established and maintained pursuant to a "written instrument." 29 U.S.C. § 1102(a)(1). In determining the intent of the parties, a court first look to the "written instrument" which forms the agreement for clear manifestations of intent. *See Policy v. Powell Pressed Steel Co.*, 770 F.2d 609, 614 (6th Cir.1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986). *See also in re White Farm Equipment Co.*, 788 F.2d 1186, 1193 (6th Cir.1986) ("the parties may themselves set out by agreement or by private design, as set out in plan documents, whether retiree welfare benefits vest, or whether they may be terminated"). It is hornbook law that if the written instrument is clear and unambiguous, the court should look no further. However, if the written instrument contains ambiguities, the Court may consult extrinsic evidence in an attempt to determine the intent of the parties. *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir.1993).

BFG maintains that the plaintiffs have no vested right to welfare benefits because BFG clearly reserved its rights to modify or terminate the plans at any time. This was done, BFG asserts, through the clause in the Highlights booklet which it maintains is part of its Summary Plan Descriptions. In this circuit, a reservation of rights provision in a Summary Plan Description prevails over any argument by a retiree that lifetime benefits have been provided through other language in the plan. *Musto v. American General Corp.*, 861 F.2d 897, 902 (6th Cir.1988). *See also Sprague v. General Motors Corp.*, 92 F.3d 1425, 1437, *vacated and pet'n for hearing en banc granted*, 102 F.3d 204 (6th Cir.1996) ("Where a summary plan description contains both a reservation of right provision and a promise of lifetime benefits, the general rule in this Circuit is that the plan unambiguously retains the company's right to amend the plan

bad business, but that is not the same thing as a breach of fiduciary duty." *Howe*, 36 F.3d at 753 (emphasis added).

*Howe* also contains language indicating the Eighth Circuit further found a breach of fiduciary duty in the fact that retirees' benefit obligations were transferred to the new company without their consent. However, *Howe* is the only cited ERISA case even hinting that the consent of retirees is required for plan transfer, and it is not controlling in this circuit. The Court is of the view that the portion of the *Howe* opinion grounded in lack of consent of the retirees, while arguably helpful to the plaintiffs, is an anomaly contrary to the wave of other case law on the extent of fiduciary responsibilities under ERISA. The hard fact for the plaintiffs is that if ERISA does not require consent for outright termination of benefits, it cannot logically be held to require consent for a transfer of benefits liability which was not made in bad faith.

and that provision must govern"). Thus if the Court were to find that the Highlights booklet was a part of the SPDs, this would be a much easier case; it would be clear the plaintiffs would be foreclosed from arguing they had vested rights through the SPDs.

However, the Court finds that the Highlights booklet is *not* a part of the SPDs. It is separate and apart from the SPDs and has none of the characteristics of an SPD as required by ERISA.[13] It simply purports to summarize the other booklets and cannot be read to affect the retirees in any substantive manner. Indeed, the Highlights booklet itself states, "If there is any conflict between the brief descriptions presented here and the formal plans themselves, the latter will govern in all cases." The attempted reservation of rights in the Highlights document cannot be presumed to be imported into each SPD. Thus with one exception,[14] the SPDs in effect at the time of the plaintiffs' retirement contained no express reservation of rights clauses.

However, the mere absence of a reservation of rights clause does not establish that plan benefits are vested. *Helwig*, 93 F.3d at 248 ("Until benefits have vested, employers may modify them or terminate them, whether or not they have reserved the right to do so"). Plaintiffs bear a greater burden than merely showing the absence of a reservation of rights clause. It is the plaintiffs' burden to show that it was "the intention of the parties" that the benefits provided at retirement would continue for life. *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1298 (6th Cir.1991). Because under ERISA welfare benefit plans normally do not vest, plaintiffs must establish an affirmative obligation by BFG to guarantee the benefits at issue for life. Courts may not casually infer the existence of vesting; doing so would undercut Congress' considered decision that, while pension benefits are strictly regulated and guaranteed, welfare benefits have no such protection. *See White Farm*, 788 F.2d at 1191 (comparing ERISA regulation of pension v. welfare programs). *See also Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 937 (5th Cir.) ("extra-ERISA commitments must be found in the plan documents and must be stated in clear and express language"), *cert. denied*, 510 U.S. 870, 114 S.Ct. 196, 126 L.Ed.2d 154 (1993); *Gable v. Sweetheart Cup Co., Inc.*, 35 F.3d 851, 855 (4th Cir.1994) (courts may not lightly infer the existence of an agreement to vest benefits), *cert. denied*, 514 U.S. 1057, 115 S.Ct. 1442, 131 L.Ed.2d 321 (1995).

In the Sixth Circuit, the following SPD language was held sufficient to confer vesting of benefits in *Helwig*, 93 F.3d at 248:

> When you are retired, your Health Care coverages, except for vision, are continued without cost to you.
>
> If you terminate employment with Kelsey–Hayes at age 65 or older for any reason other than discharge, all of your Health Care coverages, except vision care, will be continued *for the rest of your life* without cost to you.

*Id.* at 248 (emphasis added). *See also Policy v. Powell Pressed Steel Co.*, 770 F.2d 609, 614 (6th Cir.1985) (language providing health insurance coverage " 'during the life of the pensioner at no cost to the pensioner' ... clearly means that the pensioner will receive health benefits for the remainder of his life"), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986).

In contrast to the above-quoted language, the SPDs at issue do not provide a clear and affirmative commitment by BFG to provide benefits for life. For example, the hospitalization brochure at the time of Sengpiel's retirement stated, "Employees who retire and who are eligible for a pension will be eligible for coverage." (Sengpiel affid. at Exh. B–1 at 11). The hospitalization SPD in

13. 29 U.S.C. § 1022 requires a summary plan description to include such information as the name and type of administrator, the name and address of the agent, procedures for appeal and ERISA rights. Requirements are detailed in 29 C.F.R. § 2520.102–3 (contents of Summary Plan Descriptions).

14. The 1974 Major Medical Plan, effective at the time of Sengpiel's retirement, continued a reservation of rights clause. However, the updated version of the plan in 1977 contained no such clause. No other plan in effect at the time of the plaintiffs' retirement contained a reservation of rights clause.

effect when Kelly and Gottschalk retired stated, "If you retire and are eligible for a pension, you shall continue to have this same health coverage." (Gottschalk affid. at Exh. D at 11). There is no promise of lifetime benefits.[15]

*2. Reference to Extrinsic Evidence*

The plaintiffs argue that the language in the SPDs is ambiguous, allowing the Court to consult extrinsic evidence to determine the intent of the parties. "[I]n this circuit, before a district court can consider extrinsic evidence of the parties' intent, it must find an ambiguity on the face of the contract." *Schachner v. Blue Cross and Blue Shield of Ohio,* 77 F.3d 889, 893 (6th Cir.), *cert. denied,* — U.S. —, 117 S.Ct. 173, 136 L.Ed.2d 114 (1996).

A contract is ambiguous if it is subject to two reasonable interpretations. *Wulf v. Quantum Chem. Corp.,* 26 F.3d 1368, 1376 (6th Cir.) *cert. denied,* 513 U.S. 1058, 115 S.Ct. 667, 130 L.Ed.2d 601 (1994). "*If* a court determines that a contract provision is ambiguous, *then* it 'may use traditional methods of contract interpretation to resolve the ambiguity, including drawing inferences and presumptions and introducing extrinsic evidence.' " *Schachner,* 77 F.3d at 893 (emphasis in original) (citing *Wulf,* 26 F.3d at 1376). The Sixth Circuit has emphasized that courts must find a true ambiguity before resorting to extrinsic evidence:

> Courts may not ... use extrinsic evidence to create an ambiguity. Rather, the ambiguity must be patent; that is, apparent on the face of the contract. In *Local 783, Allied Industrial Workers v. General Electric Co.,* 471 F.2d 751 (6th Cir.), *cert. denied,* 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55 (1973), we wrote that "[o]nly when the court has determined that the contract is ambiguous is a construction of the clause necessary. After a finding of ambiguity has been made, extrinsic evidence is admissible to aid in its interpretation."

*Schachner,* 77 F.3d at 893 (citation omitted).

Thus without a finding that the SPD language is ambiguous, the Court is not free to consult extrinsic evidence to determine the plaintiffs' contract-based ERISA rights. The plaintiffs argue that the lack of a reservation of rights clause renders the SPDs ambiguous. The Court disagrees. Accepting the plaintiffs' argument would allow a court, every time a plan does not contain a reservation of rights clause, to declare a plan ambiguous and resort to extrinsic evidence. This comes very close to placing the burden on the defendant to show that a plan is *not* vested rather than maintaining the burden on the plaintiff to provide an affirmative showing of vesting.

In sum, the mere lack of a reservation of rights clause does not render the SPDs ambiguous. A fair reading of the SPDs does not indicate that BFG intended to guarantee the benefits to retirees for life. Thus the plans are not "subject to two reasonable interpretations," *Wulf,* 26 F.3d at 1376, and the Court is not permitted to consult extrinsic evidence.[16]

*3. In Any Event, Extrinsic Evidence Would Not Help the Plaintiffs*

Even if the Court were to have found the language of the SPDs to be ambiguous, consulting all of the available extrinsic evidence would not have led to a different decision. Despite troubling conflicts in the extrinsic evidence, the plaintiffs fail to meet their bur-

15. It is true that some of the plans contained language stating that the surviving spouse of a retiree would be eligible for benefits until "death or remarriage." The Court does not believe that the retirees can bootstrap themselves into a lifetime of vested benefits because of language referring to coverage for spouses in the event they predecease the spouse, particularly when there is no similar promise of benefits to retirees to cover them during their lifetimes.

16. The lack of vesting language in this case is illustrated by comparing the language to language which has been held to provide vesting of benefits. *See Helwig,* 93 F.3d at 246 ("all of your Health Care coverages ... will be continued for the rest of your life without cost to you") and *Policy,* 770 F.2d at 611 ("Despite anything to the contrary herein contained, present pensioners ... will ... receive medicare complimentary coverage ... during the life of the pensioner at no cost to the pensioner").

den of establishing the parties intended benefits to vest at the time of retirement.

Primary among the extrinsic evidence is the reservation of rights clause contained in the Highlights booklet. As discussed previously, the clause was not sufficiently incorporated into the SPDs to be considered a part of those documents. However, if the Court expanded its inquiry to include extrinsic evidence, the clause would be a strong indication that BFG did not intend the benefits to vest.[17]

Moreover, the plaintiffs' contention that all of their welfare benefits vested for life at the time of their retirement is fatally undercut by their own representations in this case. In an earlier brief in this case, plaintiffs' counsel conceded that the plaintiffs "do not challenge the abstract legal right of [BFG] to amend or terminate retiree welfare benefit plans...." (Docket No. 32 at 2). This is contrary to the current contention that some or all benefits became fully vested at the time of their retirement by virtue of the language in the SPDs. Moreover, to a greater or lesser degree, each plaintiff conceded he had not been promised lifetime benefits by BFG at the time of retirement. Kelly testified during his deposition as follows:

Q. Did [BFG representative Tom Bright] describe[ ] for you the benefits you were getting upon retirement?

A. That's right.

Q. Did he make any representation to you that those benefits would last the rest of your life without change?

A. He didn't make anything, no.

Q. He simply described what you were getting when you retired?

A. That's right, when I retired.

Q. Did any representative of BFGoodrich ever tell you that these benefits would continue for the rest of your life without change?

A. No.

(Kelly depo. at 35). Sengpiel testified as follows:

Q. What is it you want out of this lawsuit, sir?

A. To be transferred back to the BFGoodrich Company.

Q. Anything else?

A. That's it.

Q. You understand that Goodrich is free to change your benefits at any time?

A. Yes, sir. I also understand that their benefits for the people that were in the lottery that stayed with BFGoodrich are much better than ours.

(Sengpiel depo. at 79).[18] Gottschalk's testimony was more equivocal but was otherwise similar to the testimony of the other two plaintiffs:

Q. No one from Goodrich ever told you that your benefits would stay the same for the rest of your life and never be reduced or changed? Is that correct?

A. I think the employees, over the years, understood—

Q. Mr. Gottschalk, I didn't ask whether you understood—

A. I've got to answer.

Q. The question is did anybody ever tell you that?

A. No. No. There was no reason to receive that type of a comment.

(Gottschalk depo. at 50).

By their own admission and the admission of counsel, plaintiffs' quarrel is not with cut-

17. BFG could hardly be accused of attempting to hide its intent to reserve rights. The Highlights booklet was the first booklet in the packet of SPDs, and the reservation of rights clause was in the first paragraph of the Highlights booklet.

18. Although Sengpiel provided an affidavit saying he was told at the time of his retirement that his benefits would continue for life, he acknowledged in the above-quoted passage of his deposition that the benefits could change and also testified he was aware of the reservation of rights provision in the Highlights booklet prior to his retirement. A party may not "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts ... earlier deposition testimony." *Reid v. Sears Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986).

backs *per se;* it is with cutbacks *by UGTC.*[19] This is at odds with their argument that they believed their benefits became non-forfeitable at the time they retired.

Looming in the background is one significant piece of extrinsic evidence favorable the plaintiff's to some degree. As discussed on page 1326 *supra,* at the time of their retirement the plaintiffs signed a form entitled "Employee's Release." The form stated the following:

> I have read and understand the above calculation and agree to accept the payments of Total Monthly Pension in the amount set forth above, in settlement of my rights under all B.F. Goodrich Employee Benefit Programs applicable to me, subject, however, to all future reductions permitted in accordance with the provisions of the Company's Pension Program applicable to me; and in consideration of such payments, I hereby release and forever discharge the Company from any other obligations under its present or future Employee Benefit Programs except for payments of future premiums on my adjusted Group Life Insurance and payment of Hospitalization Program benefits to the extent described in such applicable Programs.... [20]

The plaintiffs argue that these releases are evidence of the parties' intent that life insurance and hospitalization benefits would be vested. The defendants contend that, at best, the releases confine any purported "contract right" to be limited "to the extent described in [the] applicable [p]rograms." Because "the applicable programs" have reduced their benefits, the plaintiffs are not entitled to more than what they currently receive, according to the defendants.

The Court finds it exceedingly difficult to reconcile the language of the releases with the rest of the documentary and testimonial evidence in the case. If the Court were to delve into extrinsic evidence, there is a clear conflict on critical points. In the plaintiffs' favor is the language of the release. In the defendants' favor are the fact that BFG's intent has been published in the Highlights booklet since 1977 and the plaintiffs and their counsel have in fact acknowledged BFG's "abstract legal right" to reduce their benefits.

The Court is of the view that, evaluating the extrinsic evidence as a whole, the plaintiffs have failed to meet their burden of establishing that the parties, by private design, agreed to vest benefits which normally are not vested under ERISA. The language of the employee's releases does not overcome the lack of a clear commitment to vest in the SPDs, the constant and conspicuous statement of reserved rights in the Highlights booklet and the on-the-record assertions of the plaintiffs and their counsel acknowledging BFG's legal right to change benefits.

The Court adds a final note before concluding its discussion on the employee releases. If the Court were to have held that the release overrode the SPDs and all conflicting extrinsic evidence, several negative consequences would flow to the plaintiffs. First, any relief for the plaintiffs would clearly be limited to life insurance and hospitalization benefits. This is because the release, if operative, would "forever discharge the Company from any other obligations under its present or future Employee Benefit Programs." Second, the release would be construed to limit the plaintiffs' benefits under the life insurance and hospitalization benefits to the benefits provided to them *at the time of their retirement.* Although such a conclusion would restore the plaintiffs to a higher life insurance benefit, the plaintiffs would see reductions in many categories of hospitalization benefits. For example, the plan in effect

19. The plaintiffs make no argument that UGTC, pursuant to its plans, has not reserved the right to modify or terminate the plans. Indeed, they could make no such argument; UGTC has submitted documentation that its health care plans for BFG retirees contain a reservation of rights clause (Docket No. 84). To the extent the plaintiffs challenge the fact that the changes were made by UGTC rather than BFG, their argument really is with the fact of the *transfer* rather than the fact of the *reduction.* As the Court has previously held in Section IV.B., the transfer was not unlawful.

20. Sengpiel's release form contained an additional paragraph in which he agreed not to be employed by a competitor for a period of five years.

when Sengpiel retired provided a maximum of $10 per day for doctor's visits, while the program in effect when Kelly and Gottschalk retired provided $25 for the first day's visit and $17 for subsequent visits. Although these benefits were subsequently increased by BFG, it would be logically inconsistent to allow the plaintiffs to benefit from the plan improvements and be exempt from negative plan changes, such as the present reservation of rights clauses in the Michelin plans.[21] Thus enforcement of the release forms would be a pyrrhic victory at best and could be harmful to the plaintiffs.

*4. The Ong Letter*

The plaintiffs offer one other ground to sustain a contract claim against BFG. They argue that CEO Ong's letter to Gottschalk and a handful of other retirees constituted a promise by the company to provide benefits equal to the benefits provided to BFG corporate retirees who had not been transferred to the UGTC rolls.[22]

The Ong letter, written five years after the most recent retirement of any plaintiff, has no bearing on the intent of the parties at the time of retirement and thus was not relevant to the discussion on vesting.[23] However, as a potentially independent source of obligation on the part of the defendants, it bears close scrutiny. Again, it states in relevant part:

> Turning now to your concerns regarding your retiree medical benefits and the continuance of your life insurance. Retiree medical and life insurance benefits are not paid from a trust fund but are paid from current revenues. You are correct that UGTC has undertaken the primary obligation to provide you with these benefits. We are confident that Uniroyal Goodrich will continue to be a major factor in the North American tire business and will continue to discharge its obligations to you. I can assure you that, although the obligation to pay these benefits is with UGTC, you may properly look to Goodrich to satisfy the rights you enjoy pursuant to the retiree medical benefits plan and the retiree life insurance plan in the unlikely event UGTC fails to provide them.
>
> Those rights are, of course, as described in written plans and you should understand that nothing that I have expressed in this letter is intended to alter any plan or expand any of those rights, and I do not intend by this letter to imply that the right to amend those plans is waived. Similarly, however, nothing in the assumption of liability by UGTC is intended to diminish such rights as you may have under those plans or to prevent you from looking to Goodrich to honor them if UGTC fails to do so.

(BFG Exh. J). In the Court's view, the letter can be construed as being misleading to a lay person, particularly a person who is reading the letter looking for reassurances. Indeed, the tone of the entire three-page

21. There is absolutely no language in any writing indicating that BFG promised or intended that retirees would receive increased levels of benefits throughout their retirement but would not be subject to any negative amendments.

22. The plaintiffs also refer to oral conversations between Ong and plaintiffs Kelly and Sengpiel. They allege Ong promised them orally that they "would be treated the same as the other Goodrich retirees" (Kelly depo. at 19). However, the Sixth Circuit has made clear that "the clear terms of a written employee benefit plan may not be modified or superseded by oral undertakings on the part of the employer." *Musto,* 861 F.2d at 910. This is because "ERISA makes it mandatory that 'every' plan be established and maintained under 'a written instrument.'" *Id.* (citing 29 U.S.C. § 1102(a)(1)). As *Musto* concluded:

> It is not always easy to determine exactly what a benefit plan says even when the language of the plan has been reduced to writing. If the terms of these often complex plans could be made to depend upon evidence as to oral statements that may not have been worded very precisely in the first place, that may have been made many years earlier, and that cannot be proved except through the testimony of lay witnesses whose memories will seldom be infallible and who, being human, may have tended to hear what they wanted to hear, the degree of certainty that Congress sought to provide for would be utterly impossible to attain.

*Id.*

23. Even if the letter were considered to bear upon the intent of the parties at the time of retirement, it would do more harm than good to the plaintiffs' vesting argument. This is because the letter stated that the company had the right to amend the plans. It does not manifest an intent that benefits would be vested at the time of retirement.

letter is one of reassurance.[24] Ong even provided a handwritten note to Gottschalk at the end of the letter stating in part, "I enjoyed talking with you on the phone earlier this afternoon and am glad my comments allayed your concerns. Thanks for writing."

Nevertheless, the Court cannot hold that this letter created obligations on behalf of BFG where such obligations had not existed previously. As discussed in Section IV.C. 1, the plaintiffs have failed to establish that the SPDs conferred vested benefits at the time of retirement. In the absence of an agreement to vest, ERISA allows an employer to amend, modify or terminate a benefits plan. Indeed, Ong stated he did not intend to "imply that the right to amend those plans is waived." The result is that the letter, at least with respect to welfare plans,[25] pledged a good deal less than the retirees might have believed.[26]

The Court admits being troubled by what could be considered reasonable reliance upon the letter by the plaintiffs. The Court has considered the plaintiffs' argument that BFG should be equitably estopped from contending it is not required to make up the difference between the benefits currently received by the plaintiffs and the benefits received by non-transferred BFG retirees. The Sixth Circuit has held that principles of equitable estoppel are part of the federal common law of a contract-based ERISA action. *Armistead v. Vernitron Corp.*, 944 F.2d 1287 (6th Cir.1991). The elements of equitable estoppel are: 1) conduct or language amounting to a representation of material fact; 2) awareness of the true facts by the party to be estopped; 3) an intention on the part of the party to be estopped that the representation be acted on; 4) unawareness of the true facts by the party asserting the estoppel; and 5) *detrimental* and justifiable reliance by the party asserting estoppel. *Id.* at 1298 (emphasis added).

Even if the plaintiffs were able to establish the first four elements of an equitable estoppel argument, their case would fail on the fifth. Reliance must be detrimental. The detriment claimed by the plaintiffs is the fact that they elected not to sue BFG after receiving the assurances by Ong. But there is no detriment in declining to sue because, under the Court's analysis, a lawsuit would not have reinstated them to the rolls of BFG any more successfully in 1989 than it does in 1997. This is because, as discussed previously, the transfer violated no fiduciary duty owed by BFG to the plaintiffs and the plaintiffs were unable to show a vesting of benefits. Thus the plaintiffs' argument based in equitable estoppel fails.[27]

### D. *UGTC/Michelin's Motion for Summary Judgment*

The plaintiffs do not allege wrongdoing on the part of UGTC/Michelin. The only relief sought with respect to UGTC/Michelin is assignment away from its retirement rolls to the rolls of BFG. Because the Court has found that the transfer of the retirees to UGTC/Michelin does not violate ERISA, the relief sought by the plaintiffs cannot be granted. Therefore UGTC/Michelin's motion for summary judgment is granted.

## V. *CONCLUSION*

The plaintiffs' claim that their transfer to the retirement rolls of UGTC constituted a breach of fiduciary duty on behalf of BFG is unsuccessful because the transfer was not a fiduciary act. The secondary claim that the 1995 reduction in benefits constituted a con-

24. The Court attaches a complete copy of the letter as Exhibit A.

25. The letter devoted much more space to discussing the retirees' pensions and providing specific examples of action taken by BFG to ensure that the pensions would be fully provided for life.

26. The letter may take on greater legal significance should UGTC in the future fail to provide benefits (or reduce them to a de minimis level). That situation is not before the Court today.

27. *Compare with Armistead v. Vernitron, supra,* in which the defendant was estopped from denying welfare benefits it promised to the plaintiffs *prior* to the plaintiffs taking early retirement. The plaintiffs relied upon that promise when they elected to take early retirement. In contrast, in the instant case the plaintiffs had been retired long before any promise made by Ong.

tract-based ERISA claim fails because the plaintiffs fail to establish that their benefits were vested.

For these reasons the Court grants the motions for summary judgment of BFG (Docket No. 55) and UGTC/Michelin (Docket No. 53). The Court will publish a judgment entry contemporaneously with the issuance of this memorandum opinion.

IT IS SO ORDERED.

**BFGoodrich**

The BFGoodrich Company
3925 Embassy Parkway
Akron, Ohio 44313

John D. Ong
Chairman of the Board

January 12, 1988

Mr. Don R. Gottschalk
1115 Lucia Drive
Punta Gorda, Florida 33950

Dear Don:

Thank you for your letter of January 4 expressing your concerns about payment of the pension, medical and life insurance benefits you enjoy as the result of your retirement. Although we received only two or three inquiries from retirees at the time that The Uniroyal Goodrich Tire Company was created and the administration of retirement benefits assumed by it, your letter indicates that you and perhaps others feel uneasy about the arrangement that was made then. I had hoped that UGTC's provision of benefits over the past seventeen months would have alleviated any concerns you may have. I am, however, pleased to pass on to you these further assurances.

Let me first address your pension. As you undoubtedly know, pension payments are made from a trust fund of pension assets. When The Uniroyal Goodrich Tire Company was created in August of 1986, a portion of the assets which supported the separate pension plans for Goodrich salaried and hourly employees were then transferred into pension asset trust funds to be administered by UGTC. UGTC has administered your pension since that time and I believe that you and all other retirees have regularly received your pension checks.

At the time of the formation of Uniroyal Goodrich, the pension assets transferred were sufficient to provide for the pensions of all retirees, including yourself, who were transferred to Uniroyal Goodrich, and there continue to be sufficient assets in the trust to provide for these obligations.

We took several steps to ensure that the transfer of pension obligations was conscientiously and prudently accomplished:

- We engaged an independent actuary, other than the plans' appointed actuary, to perform the necessary calculations and certify those calculations to the Internal Revenue Service.

PLAINTIFF'S
EXHIBIT
8
ONG 5/21/96

EXHIBIT A (Page 1 of 3 pages)

- We followed ERISA guidelines in performing all the calculations relating to the transfers.
- We reviewed the entire process with outside legal counsel.
- We filed appropriate notification of the transfers with and received approval for the transfers from the Internal Revenue Service and the Pension Benefit Guaranty Corporation.
- We filed all the plans with the Internal Revenue Service for qualification under the Internal Revenue Code and received determinations of qualification.
- We filed appropriate notifications with the Department of Labor confirming that the transfers indeed took place.

The net result of the care we took in 1986 is that the assets in these funds are sufficient to meet the pension obligations owing to the Goodrich employees who, such as yourself, had then retired.

We are going one step further in our current transaction. In order to protect the trust funds from the possibility of dilution, we have received assurance from the principals who will control UGTC that, as part of our transaction, they will agree that neither of the former Goodrich pension plans (i.e., the salaried plan and the hourly plan) which UGTC administers will be merged with any other pension plan unless all plans which are part of the merger are fully funded.

Turning now to your concerns regarding your retiree medical benefits and the continuance of your life insurance. Retiree medical and life insurance benefits are not paid from a trust fund but are paid from current revenues. You are correct that UGTC has undertaken the primary obligation to provide you with these benefits. We are confident that Uniroyal Goodrich will continue to be a major factor in the North American tire business and will continue to discharge its obligations to you. I can assure you that, although the obligation to pay these benefits is with UGTC, you may properly look to Goodrich to satisfy the rights you enjoy pursuant to the retiree medical benefits plan and the retiree life insurance plan in the unlikely event UGTC fails to provide them.

Those rights are, of course, as described in written plans and you should understand that nothing that I have expressed in this letter is intended to alter any plan or expand any of

The BFGoodrich Company

January 12, 1988
Page 3.

those rights, and I do not intend by this letter to imply that the right to amend those plans is waived. Similarly, however, nothing in the assumption of liability by UGTC is intended to diminish such rights as you may have under those plans or to prevent you from looking to Goodrich to honor them if UGTC fails to do so.

In your letter you also mention other benefits. I think that the other benefits you may have in mind come within the category of either retiree medical insurance or life insurance. I hope, therefore, that I have addressed all of your concerns and that I have been responsive to them.

With kind regards.

Sincerely,

John

John D. Ong

3105n

P.S. I enjoyed talking with you on the 'phone earlier this afternoon and am glad my comments allayed your concerns. Thanks for writing.

J

*JUDGMENT ENTRY*

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Judgment Entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that the motions for summary judgment of the B.F.Goodrich Company defendants (Docket No. 55) and the Uniroyal Goodrich Tire Company/Michelin defendants (Docket No. 53) are granted. Each party to bear its own costs. Case closed.